IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | : APPELLATE DOCKET NUMBER |
| | : 17-1681 |
| Appellee, | : |
| | : |
| -v- | : |
| | : |
| LEROY BROOKS | : |
| | : |
| Appellant. | : ELECTRONICALLY FILED |

_____

ON APPEAL FROM A FINAL JUDGMENT
OF CONVICTION AND SENTENCE OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.N.J. CRIMINAL NO. 14-382 (RMB))

_____

**APPELLANT'S OPENING BRIEF**

_____

Richard Sparaco, Esq.
Attorney for Appellant
Bar ID# 021291981
1920 Fairfax Ave.
Cherry Hill, NJ 08003
(856) 751-8888
rsparaco@me.com

Appellant is confined.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................iv-viii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION PURSUANT TO F.R.A.P. 28(a)(4)(A) THROUGH (D) ......................................1

STATEMENT OF ISSUES AND STANDARD OF REVIEW ............................1

STATEMENT OF RELATED CASES ................................................................3

CONCISE STATEMENT OF THE CASE ..........................................................3

RELEVANT FACTS ...........................................................................................8

PROCEDURAL HISTORY ...............................................................................17

ISSUES PRESENTED FOR REVIEW ..............................................................18

SUMMARY OF ARGUMENT ..........................................................................19

LEGAL ARGUMENT.........................................................................................20

I. ASSUMING ARMSTRONG APPLIES, APPELLANT SATISFIED THE INITIAL THRESHOLD FOR DISCOVERY BY PRESENTING IDENTIFIABLE, SPECIFIC CAUCASIAN INDIVIDUALS WITH CRIMINAL RECORDS FOR ROBBERY WHO RESIDED IN THE TARGET COUNTY/AREA AND WHO WERE AT LIBERTY AT THE TIME OF THE STING TARGETING, AND THUS COULD CONSTITUTE AVAILABLE, SIMILARLY SITUATED NON-MINORITIES WHOM THE GOVERNMENT COULD HAVE TARGETED BUT DID NOT TARGET.......................................................... 20-21

II. WHEN THE UNDERCOVER ATF AGENTS CREATED AND PROMOTED A COMPLETELY FICTIONAL CRIME AND ENTICED ACTORS WHO HAD NO CONNECTION WITH ONGOING ROBBERIES, THIS CASE MET OR EXCEEDED THE TEST FOR FINDING OUTRAGEOUS GOVERNMENT MISCONDUCT, THUS MERITING DISMISSAL.................................................................. 24

III. THE COURT LACKED JURISDICTION FOR WANT OF
  EVIDENCE OF EFFECT ON INTERSTATE COMMERCE, AND THE
  GOVERNMENT FAILED TO PROVE SUCH EFFECT................................33

IV. THE COURT SHOULD HAVE APPLIED A TWO-LEVEL MINOR
  ROLE ADJUSTMENT WITH REGARD TO THE DRUG
  CONSPIRACY PURSUANT TO §3B1.2(a) OF THE FEDERAL
  SENTENCING GUIDELINES........................................................................38

V. THE APPELLANT'S MOTION TO VACATE HIS CONVICTION OF
  VIOLATION OF CARRYING A FIREARM IN FURTHERANCE OF A
  CRIME OF VIOLENCE UNDER 18 U.S.C. § 924(c) SHOULD HAVE
  BEEN GRANTED. ...........................................................................................39

    A.  The Jury Verdict Was Ambiguous: It Was Unknown Whether the
        Jury Found the Appellant Guilty of Carrying a Firearm in
        Furtherance of a Hobbs Act Robbery Conspiracy or Carrying a
        Firearm in Furtherance of a Drug Conspiracy......................................39

    B. B. The Hobbs Act Robbery Under § 1951(b) Did Not Qualify as a
        "Crime of Violence" Under the Force Clause of § 924(c)(3)
        Because It Can Be Committed Without the Use, Attempted Use, or
        Threatened Use of Violent Physical Force. ...........................................40

        i. Section 924(c)(3)'s Residual Clause is Unconstitutionally
           Vague and Cannot Support a Conviction Under the Statute......48

CONCLUSION...................................................................................................52

CERTIFICATION OF ADMISSION TO PRACTICE .......................................53

CERTIFICATE OF COMPLIANCE .................................................................53

CERTIFICATION OF FILING AND SERVICE.................................................54

# TABLE OF AUTHORITIES

## CASES

Begay v. United States,
    553 U.S. 137 (2008) ......................................................................... 49

Bond v. United States,
    134 S. Ct. 2077 (2014) .................................................................... 37

Chambers v. United States,
    555 U.S. 122 (2009) ......................................................................... 50

Chrzanoski v. Ashcroft,
    327 F. 3d 188 (2d Cir. 2003) .................................................... 45, 47

Dalton v. Ashcroft,
    257 F. 3d 200 (2d Cir. 2001) ......................................................... 46

Descamps v. United States,
    135 S. Ct. 2551 (2013) .................................................................... 43

Freeman v. United States,
    No. 15-3687 (2d Cir. January 26, 2016) ...................................... 41

James v. United States,
    550 U.S. 192 (2007) .................................................................. 42, 49

Johnson v. United States,
    135 S. Ct. 2551 (2015) ............................................................ passim

Johnson v. United States,
    559 U.S. 133 (2010) ......................................................................... 44

National Federation of Independent Business (NFIB) v. Sebelius,
    132 S. Ct. 2566 (2012) .................................................................... 34

Office of Senator Mark Dayton v. Hanson,
    550 U.S. 511 (2007) ......................................................................... 36

Ramirez v. United States, 799
  F. 3d 845 (7th Cir. 2015) ................................................................. 43

Ruiz v. United States,
  No. 16-1193 (7th Cir. February 19, 2016) ....................................... 41

Sorrells v. United States,
  53 S. Ct. 210 (1932) ......................................................................... 25

Sykes v. United States,
  564 U.S. 1 (2011) ............................................................................. 50

Taylor v. United States,
  495 U.S. 575 (1990) ......................................................................... 49

United States v. Armstrong,
  517 U.S. 456 (1996) ................................................................. passim

United States v. Bass,
  536 U.S. 862 (2002) ................................................................... 21, 37

United States v. Beverly,
  723 F. 2d 11 (3d Cir. 1983) ............................................................. 28

United States v. Black,
  733 F. 3d 294 (9th Cir. 2013). ........................................................ 31

United States v. Dennis,
  826 F. 3d 683 (3d Cir. 2016) ............................................................. 4

United States v. Fox,
  95 U.S. 670 (1878) ........................................................................... 37

United States v. Gracia-Cantu,
  302 F. 3d 308 (5th Cir. 2002) ......................................................... 46

United States v. Hudson,
  No. 2:l3-cr-126-ODW-3 (C.D. Cal 3/10/14) ................................... 30

United States v. Lakhani,
    480 F. 3d 171 (3d Cir 2007) ............................................................. 28

United States v. Leja,
    563 F. 2d 244 (6th Cir. 1977) .......................................................... 26

United States v. Lopez,
    514 U.S. 549 (1995) ....................................................................... 34

United States v. Maldonado,
    No. 12-3487-cr, 2016 WL229833 (2d Cir. Jan. 20, 2016) ............................... 43

United States v. Morrison,
    529 U.S. 598 (2000) ................................................................. 34, 37

United States v. Nolan-Cooper,
    155 F. 3d 221 (3d Cir 1998) ............................................................ 28

United States v. Perez-Vargas,
    414 F. 3d 1282 (10th Cir. 2005) ....................................................... 45

United States. v. Peterson,
    236 F. 3d 848 (7th Cir. 2001) ........................................................... 7

United States v. Pitt,
    193 F. 3d 751 (3d Cir. 1999) ........................................................... 30

United States v. Joe Roberts,
    CR 13-751-R-2, 3, 5 (C.D. Cal 5/30/14) ............................................... 30

United States v. Smith,
    538 F. 2d 1359 (9th Cir. 1976) ........................................................ 26

United States v. Smith,
    924 F. 2d 889 (9th Cir. 1991) .......................................................... 25

United States v. So,
    755 F. 2d 1350 (9th Cir. 1985) ........................................................ 33

United States v. Taylor,
   803 <u>F.</u> 3d 931 (8th Cir. 2015) ........................................................ 43

United States v. Torres-Miguel,
   701 <u>F.</u> 3d 165 (4th Cir. 2012) ................................................ 44, 47

United States v. Townsend, No. 14-3652, 2015 <u>WL</u>9311394, at *4 & n.14 (3d Cir.
   Dec. 23, 2015) ............................................................................. 43

United States v. Twigg,
   588 <u>F.</u> 2d 373 (3d Cir. 1978). ............................................... passim

United States v. Vivas-Ceja,
   808 <u>F.</u> 3d 719 (7th Cir. 2015) ...................................................... 41

United States v. Walker,
   657 <u>F.</u> 3d 160 (3d Cir. 2011) ...................................................... 33

United States v. West,
   511 <u>F.</u> 2d 1083 (3d Cir. 1975) .................................................... 25

## STATUTES

18 <u>U.S.C.</u>§ 924(c) ......................................................................... passim

18 <u>U.S.C.</u>§ 924(c)(3)................................................................... 42, 48

18 <u>U.S.C.</u>§ 924(c)(3)(B) ................................................................ 41

18 <u>U.S.C.</u> § 16(b) ........................................................................... 41

18 <u>U.S.C.</u> § 1951(a) ...................................................................... 17

18 <u>U.S.C.</u> § 924(c)(1)(A) ............................................................... 40

18 <u>U.S.C.</u> § 924(c)(1)(A)(ii) .......................................................... 39

18 <u>U.S.C.</u> § 924(c)(1)(A)(iii) ......................................................... 41

18 <u>U.S.C.</u> § 924(c)(3)(B) ............................................................... 41

18 U.S.C. §1951(b) ........................................................................ 47

18 U.S.C. §3231 .............................................................................. 1

18 U.S.C. §3742 .............................................................................. 1

21 U.S.C. § 846 ............................................................................. 17

28 U.S.C. §1291 .............................................................................. 2

28 U.S.C. §2255 ............................................................................ 41

C.R.S. § 18-3-204 ......................................................................... 45

Cal. Penal Code § 422(a) ............................................................. 44

Tex. Penal Code Ann.§ 22.04(a)................................................... 47

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I § 8, cl. 3........................................................... 34

United States Constitution Amendment V.................................... 25

## SENTENCING GUIDLELINES

U.S.S.G. § 2L1.2 ....................................................................... 46, 47

U.S.S.G. § 3B1.2(A) ..................................................................... 56

## OTHER SOURCES

Eda Katharine Tinto, Undercover Policing, Overstated Culpability,
     34 Cardozo L. Rev. 1401, 1446-47 (2013)....................................... 1

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION PURSUANT TO F.R.A.P. 28(a)(4)(A) THROUGH (D)

The district court has original jurisdiction over offenses against the laws of the United States under 18 U.S.C. §3231. This Court has appellate jurisdiction over the judgment pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742. The judgment, conviction, and sentence were entered on March 27, 2017 by the Hon. Renée M. Bumb, United States District Judge.  (A.1 to A.5)[1]  The Notice of Appeal was filed on March 28, 2017.  (A.6)

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

1.     In a "selective enforcement" challenge to an ATF phony stash house robbery sting,[2] did the District Court err in applying the "selective prosecution" standards set forth in United States v. Armstrong, 517 U.S. 456 (1996) in evaluating Brooks' discovery motion?

2.     Does outrageous Government conduct in creating this reverse stash-house sting operation and prosecution, where there was no cocaine, no robbery,

---

[1] "A.#" refers to appellant's appendix page number.

[2] "A 'stash house' is a location, often a residential house or warehouse, where drugs, money, and other trafficking-related items such as firearms are kept until moved to another location." Eda Katharine Tinto, *Undercover Policing, Overstated Culpability*, 34 Cardozo L. Rev. 1401, 1446-47 (2013). This "stash house" robbery scenario was an investigatory platform created by the ATF and the DEA, as there was not an actual drug "stash house."

and no evidence of any ongoing connected criminal activity, entitle appellant to an arrest of judgment/judgment of acquittal?

3.    Where there was no cocaine, no robbery, and no evidence of any planned purchase or sale of any cocaine, and thus no proof of any effect on interstate commerce, did the Court err is declining to dismiss the conspiracy to commit Hobbs Act robbery, in declining to grant a Rule 29 or Rule 33 motion, and in rejecting the defense's several applications to dismiss?

4.    Did the court err in declining to apply a minor-role adjustment with regard to the drug conspiracy pursuant to §3B1.2(a) of the Federal Sentencing Guidelines?

5.    Did the court err in declining to grant appellant's motion to vacation his conviction of a violation of carrying a firearm in furtherance of a crime of violence under 28 U.S.C 924(c)?

The Standard of Review will be noted in the body of the brief where appropriate.

## STATEMENT OF RELATED CASES

The Appellant is unaware of any cases currently pending before the Court of Appeals that are related to the instant appeal.

## CONCISE STATEMENT OF THE CASE

Across the country, in lower-income minority communities, federal agents have presented to various targets a tale about a Mexican drug cartel, a "stash house" with armed guards, and kilograms of cocaine for the taking. The agents target low-income minorities with the tempting prospect of a cocaine stash house ripe for invasion and robbery.  This target allows agents to select a malleable population and tempt them with significant monetary gain.  The agents create an entirely fictional criminal scenario, manipulating the players, the amount of controlled dangerous substances at play, and the methods required to gain access to the drugs.  This in turn controls the sentencing range and exposes defendants to high mandatory minimums and consecutive sentences based upon drugs that do not exist in any amount, and imagined violent cartel members who pose no real threat to the defendants nor to the community.  Rather than intercepting ongoing, high-level, dangerous crime, the agents create it by utilizing street level drug dealers from low-income neighborhoods.

Locally, in the District of New Jersey and its Camden Vicinage, the defendants come largely, if not exclusively, from African-American communities

3

and background.  The Government had brought several reverse sting stash house cases in the District of New Jersey in recent times, including the following:

> United States v. Shawn Cannon,
>   Criminal No.: 11-783 (RMB);
>
> United States v.  Anthony Dickey,
>   Criminal No.: 13-cr-00222-RBK-2;
>
> United States v. Malcom Brown et al.,
>   Criminal No.: 11-cr-545-RBK-1;
>
> United States v. Robert Smith,
>   Criminal No.: 14-cr-00152-NLH-1

and the present case, United States v. Brooks.  In each of these cases, all of the defendants and respective co-defendants were either African-American or minority.

The very notion of these cases raises concerns about Government overreach. The Government initiates the criminal proposal, writes the script, determines the supposed drug quantities, hypothecates the supposed obstacles to be overcome, and thus dictates the resources and means that potential participants would have to adopt to qualify as acceptable to the undercover agent posing as a criminal confederate. Cf. United States v. Dennis, 826 F. 3d 683, 698-699 (3d Cir. 2016) (Ambro, J. dissenting as to entrapment ruling but expressing concern about stash house stings approaching a due process violation and expressing "grave doubts" about the propriety of the tactic.)

4

In the present case, the specific criminal design – a home invasion robbery – came from the government agent's urgings, and overwhelmed the targets' questions and concerns in embracing the robbery scheme.  An undercover agent (UC) approached one of appellant's co-defendant, Alexander Morales, a city drug dealer, with a criminal proposal.  The UC introduced the idea of some sort of crime involving a house that had some stored cocaine.  The UC told Morales that the traffickers were dangerous and would kill anyone coming inside the house, he was looking for confirmations of violence from Morales.  Of course, there was no stash house, and no cocaine; it was just a ruse to tempt Morales into a crime.

The defense moved for dismissal due to selective prosecution, and moved for extensive discovery concerning the ATF's stash house sting program.  In aid of its motion, the defense identified multiple Caucasian individuals with known ties to Burlington County whom public records showed to have involved themselves in robbery and/or weapons offenses, and thus whom law enforcement authorities might have targeted on the same purported criteria that supposedly rendered Brooks, through Morales, as a target.

The defense unsuccessfully sought an order from the Court directing the Government to disclose whether ATF made inquiries so as to identify the pool of robbery perpetrators or suspected participants in robberies in the relevant area and timeframe, and to determine whether any of the possible candidates for a "sting"

operation was non-minority.  With respect to particular Caucasian individuals who might have logically served as targets for a stash house operation but whom the Government did not investigate, the defense gleaned from publicly available records Caucasian individuals with recent convictions for armed robbery or other armed offenses, from Burlington County, who appear to have been at liberty during the time when the ATF trained its sights on Morales. These persons constituted a pool of non-minority candidates for governmental approach and targeting, but the Government presented no evidence of making any such efforts. The identification of these Caucasian individuals in the defense moving papers should have satisfied the Armstrong[3] test and thus warranted that the Court order discovery.

The defense also moved for dismissal on the grounds of outrageous Government misconduct, in that the Government generated this fictitious crime entirely from its own effort and playbook, and involving questionable tactics.  This was a crime that would never have occurred but for the Government's persistent effort to create that crime.  See United States v. Twigg, 588 F. 2d 373 (3d Cir. 1978).

The defense also moved against the Indictment on the grounds that there was no effect on interstate commerce, such that that Court lacked subject matter

---

[3] United States v. Armstrong, 517 U.S. 456 (1996).

jurisdiction. A conspiracy to rob conceptually cannot establish even a <u>de minimis</u> effect on interstate commerce, as there was no robbery of or taking of any property; the mere fact that a good (or fictional good) happened to travel across state lines should not suffice to show an effect on interstate commerce.  <u>See United States. v. Peterson</u>, 236 <u>F.</u> 3d 848 (7th Cir. 2001).

The trial court denied all such applications.  At the close of the trial, the defense moved for a motion to vacate the conviction for violation of carrying a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c). The appellant was found guilty, as set forth in the verdict sheet (A.105-A.108), to knowingly carrying a firearm during and in relation to the commission of a crime of violence - the conspiracy to commit robbery, <u>or</u> during an in relation to the commission of a drug trafficking crime - the conspiracy to possess with intent to distribute cocaine.  The verdict sheet conveyed that the appellant could be guilty of carrying a firearm in furtherance of a crime of violence if he had either conspired to commit a robbery or conspired to distribute cocaine, but not necessarily both. However, in light of the Supreme Court's decision in <u>Johnson v. United States</u>, 135 <u>S. Ct.</u> 2551 (2015) appellant preserves his argument that the Hobbs Act Robbery no longer qualifies as a "crime of violence" because it can be committed without the use, attempted use, or threatened use of violent physical force.  The appellant argued that a Hobbs Act Robbery failed to qualify as a "crime of violence' under

either the force clause nor the residual clause.  Because the verdict sheet allowed for the jury to find the appellant carried a firearm in furtherance of a violent crime for either the Hobbs Act Robbery or the drug conspiracy, meaning they could have found that he carried it in furtherance of only the robbery, the conviction for the violation of § 924(c) should have been vacated.

The Government's proofs ultimately failed to establish a basis for a jury finding beyond a reasonable double of the requisite effect on interstate commerce, as the record did not contain evidence/testimony that there would have been an effect on interstate commerce had the robbery succeeded.

Finally, the appellant moved for a minor role adjustment as to the drug conspiracy. Unlike his co-defendants, there was no clear split of the product negotiated for the appellant, and no discussions or evidence as to what his role would be in any distribution of the product.

## **RELEVANT FACTS**

In April of 2013, and as a result of information received by two cooperating sources of information, law enforcement officers initiated a drug trafficking investigation in the City of Camden.  (A.292)  During the course of that investigation, Alexander Morales, who was identified as a heroin distributor, made several controlled sales of suspected heroin to an undercover Drug Enforcement

8

Administration ("DEA") Task Force Officer (hereinafter "UC-1") with the

nickname "Nice." (A.292-294)

As part of this investigation, law enforcement officers received information

that Morales might attempt to rob UC-1 or two cooperating witnesses if they

continued to purchase heroin from Morales, and that he was an extremely

dangerous individual with a reputation for committing such robberies.  (A.294-

295)

On or about May 3, 2013, UC-1 fabricated a story for Morales that UC-1

knew the location of a stash house where fifteen (15) kilograms of cocaine would

be stored, and that he was looking for a group of individuals interested in

conducting a robbery of that stash house. (A.311; A.414; A.1032)  In reality, there

was no stash house to rob and no cocaine to steal or sell.  Their existence, rather,

was completely fabricated by the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") in order to ensnare Morales and his confederates in a criminal

scheme that they never would have formed or joined without the government's

provocation.  UC-1 further elaborated on the story, telling Morales that the drugs

that were located inside the stash house belonged to a drug trafficking organization

("DTO"), that the members of the DTO were dangerous, and that the robbery

would not be easy to commit (meaning that the defendants would need firearms to

commit the robbery).  (A.353; A.746)   Morales responded that he was willing to

conduct the robbery and, without identifying anyone specifically and without

naming the appellant, Leroy Brooks, said that he had a crew of individuals he

utilized to conduct such robberies. (A.584)

On May 21, 2013, UC-1 met with Morales. (A.297)  During this recorded

meeting, UC-1 questioned Morales as to whether he was still interested in

conducting the robbery of the stash house. (A.297)  Morales responded by saying

he was interested and told UC-1 that he had a team ready to go. (A. 313)  Once

again, Morales did not identify who would be the members of that team.  On cross-

examination at trial, Morales admitted that the appellant was not the person he was

referring to at the time he was talking about his team. (A.584-585)  UC-1 informed

Morales that his associate (an undercover ATF Special Agent hereinafter identified

as "UC-2") was closely associated with the DTO that operated the stash house and

could arrange a meeting with Morales to further discuss the specifics of the

robbery. (A.296)

On June 4, 2013, UC-1 and UC-2 met with Morales.  (A.298) Appellant was

not present nor was his existence known to this investigation at that time.  (A.298)

Once UC-2 was introduced to Morales, he stated, "Look, this is the deal. I'll run it

to you, if you like what you hear, we'll keep talking. If not, I'll talk to somebody

else, aight?" (A.1031)  UC-2 proposed a fictitious robbery of non-existent

kilogram quantities of cocaine with Morales. (A.631; A.745)  UC-2 lied that he

10

was a drug courier responsible for transporting kilogram quantities of cocaine for a DTO. (A.523)  Specifically, UC-2 explained that once the kilograms of cocaine are picked up from the stash house operated by the DTO, UC-2 normally transports the cocaine out of state for distribution. (A.632; A.745-746)  UC-2 further explained that when UC-2 collects the cocaine, UC-2 would observe two individuals in the residence, both of whom are armed with firearms. (A.746)   UC-2 stated that while picking up the cocaine, UC-2 would observe approximately fifteen kilograms of cocaine inside the stash house. (A.747)

In reference to the robbery, Morales stated, "I'm saying, we can make it happen." (A.313)  Morales expressed his willingness to conduct the armed robbery of the drug stash house and indicated he had associates who assist in conducting such robberies. (A.313)  UC-2 informed Morales that the members of the DTO were dangerous. (A.313)  Morales responded by saying, "[w]e're not worrying about that, . . . I got a team trained to go man." (A.313)  UC-2 and Morales then discussed the split of the proceeds and agreed to meet further. (A.324)

On June 10, 2013, UC-1 and UC-2 met with Morales and Eladio Santana, whom Morales introduced as his "cousin." (A.342)  UC-1 and UC-2 had never met Santana before and had never spoken to him about the proposed robbery until he was introduced by Morales. (A.638-639)

The June 10, 2013 meeting with Morales and Santana was consensually recorded with audio and video recording devices. (A.640) UC-2 again provided the details of the robbery as was previously explained to Morales. (A.640) During this meeting, Santana asked UC-2 to provide a "physical description" of the two individuals guarding the drugs in the stash house and also asked "[h]ow do you feel around them when it come to aggression?" (A.1041-1042) UC-2 replied by stating that UC-2 was nervous when dealing with the traffickers because they are dangerous. (A.1042)

UC-2 explained that he was open to negotiating a split of the cocaine received from the robbery. (A.1042) During this meeting, in reference to the robbery, Santana stated, "[I]t's not a game, I ain't come to play, this ain't a joke. I don't give a fuck where it's at, whose grandma is in the area . . . none of that dumb shit." (A.1046) During the June 10, 2013 meeting, Santana asked what type of firearms the traffickers possessed and what kind of weapon he could expect to see when he comes in the front door. (A.1047) Santana asked, "Is there ever money involved?" UC-2 responded that there was not. (A.1053)

During this time, UC-2 began explaining that the kilograms of cocaine were marked with "cartel stamps" and that they would be dealing with "pure coke." (A.1052) Santana stated that he was not an "amateur" and also said he "never been

someone to take somebody's shit and put it back in the street the same way they gave it to me[.]" (A.325)

Morales and Santana then negotiated the split of the cocaine. (A.324)  UC-2 agreed to accept five kilograms of cocaine, and Morales and Santana agreed to accept ten kilograms of cocaine as payment for conducting the robbery. (A.324) Appellant Brooks was never discussed during these meetings thus far, and neither Morales nor Santana identified any other individual that might be involved in the robbery. (A. 331)

On June 14, 2013, UC-1 and UC-2 met with Morales in Cherry Hill, New Jersey.  (A.328)  During the meeting, which was consensually recorded, UC-2 informed Morales that UC-2 was contacted by the members of the DTO and was scheduled to pick up a quantity of cocaine the following week. (A.330)  UC-2 then questioned Morales as to whether he was still willing to proceed with the proposed robbery. (A.1067)  Specifically, UC-2 asked, "You still good wit it?" (A.1067) Morales responded, "Hell yeah." (A.1067)  UC-2 then proceeded to a nearby vehicle in which Santana and appellant Leroy Brooks were sitting (A.351), and told Santana that UC-2 had been contacted by the DTO. (A.737-738)  This appeared to have been said in the presence of the appellant, Leroy Brooks, who for the first time made an appearance in this case. (A.752)  UC-1 and UC-2 had never

met appellant Leroy Brooks before and at the time of this meeting did not know

what role, if any, he would play in the robbery. (A.752)

On June 18, 2013, appellant Brooks accompanied Morales and Santana to

Brooks' first meeting with the agents. (A.371) UC-1 was operating an undercover

law enforcement vehicle containing audio and video recording equipment and this

meeting was consensually recorded. (A.363-364)  Prior to Brooks' appearance on

the video, UC-1 demonstrated to Morales and Santiago how he had a secure secret

compartment behind the rear seats that was opened by operating a control located

in the dashboard. (A.326; A.372)  The video shows the hatch opening up, and

Santana telling UC-1 to close it quickly so as not to be seen.  Brooks is not yet in

the picture.  Santana then entered UC-1's vehicle.  Shortly thereafter, Morales and

appellant, who arrived in a car together, entered UC-1's vehicle.  Brooks is seen

taking a dark-colored opaque laundry bag out of the car that he arrived in and

placing it in the open compartment. (A.372)  After the bag is placed there, the

hatch is closed by UC-1 and the rear seats are set back up. (A.432) With the hatch

closed, it appears that it would be impossible for anyone inside the vehicle to gain

access to the contents of the compartment without UC-1 operating the switch to

open it. (A.432)

Without discussion, UC-1 drove Morales (seated in the front passenger

seat), Santana (seated in the rear passenger-side seat), and appellant Brooks (seated

14

in the rear drivers-side seat) to a storage facility. (A.371-372) While travelling to the meeting to occur with UC-2, UC-1 discussed with Morales that "the split stay the same" as they had discussed previously when they were outside the presence of Brooks, and without mentioning in any manner whether or not Brooks was going to take a share of the proceeds of the robbery. (A.1101)  Morales confirmed the prior arrangement. (A.1101)  UC-1 further stated "anything extra in there, we work that out." (A.1101)

During the drive to meet UC-2, appellant Brooks asked questions about the mechanics of the robbery and inquired about what could happen if the robbery were to take place. (A.440; 442)  For instance, appellant asked for a physical description of the two traffickers and if they were "aggressive." (A.441; A.571) Appellant also asked if "they ever have their hammers out," referring to their guns. (A.441; A.572)

UC-1 cautioned to the group in general "don't put them whole ones back out, like break that shit down so they don't know the stamp," and not to sell the stolen kilograms whole because they would be readily identifiable and the robbery could be traced back to UC-1 and UC-2.  (A.573)

Upon arrival at the meeting (where the takedown is to ultimately take place), UC-2 greeted Morales, Santana, and appellant Leroy Brooks. (A.739)  UC-2 was wearing an audio and video recording device. (A.740)  Instead of asking appellant

directly, UC-2 asked Santana "you talk to him [Brooks], everything nice?" (A.1117)  Santana only stated, "he knows just about everything we know." (A.1117)  Santana asked UC-2 when he enters the house where will the drug traffickers' firearms be located. (A.1118-1119)  UC-2 explained to Santana that one trafficker would be in the living room with a "hammer," meaning a firearm, and the other trafficker would be in the kitchen. (A.1119)  Appellant asked another question as to whether the trafficker in the kitchen would have "a firearm" on his person. (A.1119)  UC-2 stated that he has a firearm, too.  (A.1119)  Appellant Brooks also asked more questions, specifically could UC-2 describe the "physical makeup" of the traffickers. (A.1119)  UC-2 gave a physical description of the traffickers. (A.1119)  UC-2 then directly told appellant Leroy Brooks that there are "fifteen bricks in the house" and "I'm getting five and I guess you all splitting the ten." (A. 1120)   Appellant only stated "right." (A.1120)  Appellant Brooks stated, without elaboration, that "this ain't nothing new right here." (A.1121)

With regard to the robbery, UC-2 told appellant, "you do whatever you got to do, just don't kill me, homey." (A.399) Instead of verbally responding, appellant Brooks only shook his hand.  (A. 399; A.743)  UC-2 then continued to speak directly to Brooks, and Brooks stood still while Morales and Santana walked around the storage facility examining vehicles. (A.445)  Moments later, after UC-2 gave a signal to law enforcement officers on the scene, arrest units moved in from

one of the storage bins and arrested Morales, Santana, and appellant Leroy Brooks.
(A.400)

A subsequent search of the dark colored laundry bag placed in UC-1 's
vehicle revealed 1) a loaded Smith & Wesson 38 special revolver, 2) a loaded.45
caliber semi-automatic pistol, 3) a loaded .9-millimeter semi-automatic pistol, 4)
two ski masks; and 5) a black wool hat. (A.491- 493)  Additionally, law
enforcement officers recovered a taser/stun gun and a laser pointer on the ground
from the area in which Morales, Santana and appellant Leroy Brooks were arrested
and taken into custody. (A.401)

## PROCEDURAL HISTORY

In a four-count superseding indictment, appellant Leroy Brooks was charged
with conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a); conspiracy
to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C.
§ 846; felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1) and §
2; and carrying a firearm during and in relation to a crime of violence in violation
of 18 U.S.C. § 924(c)(1)(A)(i) and §2. (A.25–28)

Trial was held from January 12 to 19, 2016.  On January 19, 2016, the jury
returned verdicts of Guilty on all counts in the indictment. (A.105-A.108)  The
appellant filed a motion for new trial (A.109) along with supplemental post-verdict

motions to vacate convictions. (A.116)  The motions were denied on March 30,

2017.  (A.139)

At sentencing on March 20 and 24, 2017, appellant moved for a downward

departure from the otherwise applicable sentencing guidelines. (A.968; A.973)  On

March 24, 2017, the motion was denied (A.978-981),  and the appellant was

sentenced as follows: Imprisonment for a term of 270 months, consisting of 210

months on Count One, 210 months on Count Two, and 120 months on Count

Three, all such terms to be served concurrently; and a term of 60 months on Count

Four, to be served consecutively to each of Counts One, Two, and Three, to the

extent necessary to produce a total term of imprisonment of 270 months. (A.1-2)

The Appellant filed a timely notice of appeal.  (A.6)


## ISSUES PRESENTED FOR REVIEW

1.    Denial of appellant's motion for discovery in support of its allegation
of selective prosecution.

2.    Denial of appellant's motion for dismissal of indictment based upon
outrageous government conduct.

3.    Denial of the appellant's motion for dismissal of the indictment
based upon lack of jurisdiction.

4.    Failure to instruct the jury that they must find that the appellant
might have engaged in the conspiracy to rob a stash house absent
government prodding.

5.    Failure to grant appellant a two-level sentencing reduction
based upon minor roles in the drug conspiracy.

6.    Denial of appellant's motion to vacate his conviction of the violation of carrying a firearm in furtherance of a crime of violence.

## SUMMARY OF ARGUMENT

I.    The appellant should have been granted plenary discovery concerning the Government's selection criteria and process for pursuing Brooks' co-defendants and these cases generally, because the appellant was able to meet the initial threshold by producing some evidence that the government avoided selecting available non-minority targets who were similarly situated to the minority targeted individual, and whom the government could have targeted but did not. The defense provided a list of non-minority persons who had records more compatible with persons willing to engage in stash house robberies, and who were on the street at the time of the operation.

II.    The government was guilty of engaging in outrageous conduct in inventing a fabricated stash house and large amounts of imagined cocaine in order to lure minority individuals into a criminal scheme when they were not actively engaged in such conduct prior to law enforcement involvement, entitling the appellant to an arrest of judgment or judgment of acquittal.

III.    The Court lacked jurisdiction for lack of evidence of the effect on interstate commerce where there was no cocaine, no robbery, and no evidence of

any planned purchase or sale of any cocaine, and therefore the court should have granted the appellant's Rule 29 and Rule 33 Motions.

IV.    The Sentencing court should have applied a minor role adjustment on the drug conspiracy.  Defendant was not included in the negotiations for the split of the proceeds, nor was there any evidence as to what his role would be, or even if he would have one, after the completion of the robbery.

V.    The appellant's motion to vacate his conviction of a violation of carrying a firearm in furtherance of a crime of violence should have been granted because the jury verdict was unclear as to which crime the appellant carried a firearm in furtherance of.  The jury made a finding that he could have been carrying the gun during the Hobbs Act Robbery or the drug conspiracy.  Because the jury verdict was such that the jurors could have found that the appellant carried the gun in furtherance of the Hobbs act Robbery only, and not the drug conspiracy, the conviction should have been vacated.

### LEGAL ARGUMENT

I. ASSUMING <u>ARMSTRONG</u> APPLIES, APPELLANT
SATISFIED THE INITIAL THRESHOLD FOR
DISCOVERY BY PRESENTING IDENTIFIABLE,
SPECIFIC CAUCASIAN INDIVIDUALS WITH
CRIMINAL RECORDS FOR ROBBERY WHO
RESIDED IN THE TARGET COUNTY/AREA AND
WHO WERE AT LIBERTY AT THE TIME OF THE
STING TARGETING, AND THUS COULD
CONSTITUTE AVAILABLE, SIMILARLY
SITUATED NON-MINORITIES WHOM THE

20

GOVERNMENT COULD HAVE TARGETED BUT
DID NOT TARGET. [As a question of law, the standard
of review is plenary/<u>de novo</u>.]

To prove selective, discriminatory prosecution, a defendant must show discriminatory effect and intent in the Government's decisions about whom to prosecute. <u>United States v. Armstrong</u>, 517 <u>U.S.</u> 456 (1996); <u>United States v. Bass</u>, 536 <u>U.S.</u> 862 (2002).

A defendant alleging selective prosecution faces a formidable task, since the courts afford great deference to prosecutorial prerogative and discretion as to whom to charge and what to charge; the charging decision is a time-honored preserve of prosecutorial functioning and power. <u>United States v. Armstrong</u>, <u>supra</u>.

It is not clear, however, that this longstanding deference to "prosecutorial prerogative" ought necessarily to apply to operational decisions of law enforcement agents; police officials simply are not prosecutors. In that sense, the trial court erred in requiring a threshold showing of discriminatory effect pursuant to <u>Armstrong</u>. The Court could and should have granted the appellant discovery into the ATF's selection criteria and program for stash house sting cases.

Despite the lack of clear application of <u>Armstrong</u> to decisions of law enforcement agents, with regard to selective prosecution claims from stash house stings, defendants have generally invoked <u>Armstrong</u> and progeny in requiring

and analyzing the sufficiency of a defendant's threshold showing as to whether the defendant's motion merits further discovery. Assuming, <u>arguendo</u>, that <u>Armstrong</u> applies, the court still should have granted the appellant discovery because appellant made the requisite threshold showing. That initial threshold burden is to produce *some evidence* of discriminatory effect of the Government 's selection policy, <u>i.e.</u> that all or virtually all targets were minority, but that the Government avoided selecting non-minority persons. (emphasis added) Under this requirement, the appellant showed actual evidence that at the time of the appellant's selection and targeting, there were a dozen or more Caucasian residents of Burlington County whom the defense specifically identified who had been incarcerated and served time for robbery or related violent offenses or firearms offenses-and who had been released from incarceration and were at liberty during the time of the investigation. Appellant identified a lengthy list of "white" potential targets (See A.209-212)

These Caucasian individuals seemed to fit the criteria that the ATF was invoking to justify Brooks' targeting; indeed, they fit the supposed selection criteria, prior involvement in robberies and violent crime, better than Leroy Brooks. While Brooks does have one prior robbery conviction, it occurred twenty years prior to the arrest in this matter, whereas a number of these Caucasian individuals were incurring robbery convictions much more closely in time to the

ATF operation which targeted Brooks. That is, there were Caucasian individuals with proven backgrounds in robbery, and they appear to have been at liberty. The defense presented this data to show that the Government had failed to target similarly situated white individuals while selecting and pursuing minorities.

The Court rejected this evidence as inadequate to meet the <u>Armstrong</u> threshold burden. (A.162-163)

It is hard to imagine what reasonably available evidence could be more fitting or appropriate to satisfy the <u>Armstrong</u> threshold showing. The ATF claims to have included Brooks based upon Morales's desire to include him. However, the agents gathered no independent intelligence on Brooks. Brooks had a robbery conviction from over twenty years ago, and had only been involved in street level drug dealing. In contrast, the Caucasian Burlington County residents whom the defense identified in its pretrial submission had proven records of more recent and active violent crimes, and had served time in prison for such crimes.

In many ways, these white males were far more compelling targets than Brooks. At minimum, they were or would have been equally "attractive" as targets in a nondiscriminatory program of law enforcement. Yet the Government produced no evidence that it had in any way searched for or sought out such persons. Denying discovery to the defense made it impossible for the defense to investigate why the Government had failed to direct efforts at investigation in the

direction of identifiable whites in the community who evince the kind of criminal backgrounds that the Government appeared to invoke to justify targeting Leroy Brooks.

The defense thus satisfied whatever showing that <u>Armstrong</u> and its progeny would require. The trial court erred in not granting the plenary discovery the defense sought into the Government's selection criteria and process for pursuing Brooks and these cases in the vicinage generally.  This Court should reverse and remand for the production of such discovery and a full hearing on the question of selective governmental targeting of minorities with the ATF stash house sting program.

> II. WHEN THE UNDERCOVER ATF AGENTS CREATED AND PROMOTED A COMPLETELY FICTIONAL CRIME AND ENTICED ACTORS WHO HAD NO CONNECTION WITH ONGOING ROBBERIES, THIS CASE MET OR EXCEEDED THE TEST FOR FINDING OUTRAGEOUS GOVERNMENT MISCONDUCT, THUS MERITING DISMISSAL. [As a question of law, the standard of review is plenary/<u>de</u> <u>novo</u>.]

Dismissal of an indictment is a proper remedy where the conduct of the government and law enforcement agents is so outrageous that a violation of due process principles clearly articulated in our Constitution.  The Fifth Amendment of the Constitution provides "no person shall be deprived of life, liberty or property without due process of law," <u>United States Constitution Amendment V</u>, and the

Constitution bars the government from obtaining a conviction when the

"government's own conduct is outrageous." <u>See</u> <u>United States v. Smith</u>, 924 <u>F.</u> 2d

889,897 (9th Cir. 1991); <u>Twigg</u>, <u>supra</u>.

In 1998, the Third Circuit Court of Appeals recognized the doctrine of

outrageous government misconduct articulated in the <u>Twigg</u> opinion. The court

noted that the government operative essentially concocted and conducted the entire

scheme implicating the defendant. <u>Id.</u> at 230. The Third Circuit has also reversed,

on fundamental fairness grounds, convictions where the government behavior was

deemed to be outrageous. In <u>United States v. West</u>, 511 <u>F.</u> 2d 1083, 1085-86 (3d

Cir. 1975), the court held:

> But when the government's own agent has set the
> accused up in illicit activity by supplying him with
> narcotics and then introducing him to another
> government agent as the prospective buyer, the role of
> government has passed the point of toleration.
> Moreover, such conduct does not facilitate discovery or
> suppression of ongoing illicit traffic in drugs. It serves
> no justifying social objective. Rather, it puts the law
> enforcement authorities in the position of creating new
> crime for the sake of bringing charges against a person
> they had persuaded to participate in wrongdoing. It was
> this evil of law enforcement officers instigating a
> criminal act by persons "otherwise innocent in order to
> lure them to its commission and to punish them" that led
> the Supreme Court to its first reversal of a conviction on
> the ground of entrapment. <u>Sorrells v. United States</u>, 53
> <u>S. Ct.</u> 210, 215 (1932).

This indictment reflected and served as an example of what can be fairly

described as outrageous government conduct.  The outrageous behavior is the

conduct of the agents creating and promoting a completely fictional crime.  This

investigation and subsequent indictment was not a product of an ongoing criminal

investigation that revealed an ongoing plan to commit a crime of this magnitude.

The actors in this case were enticed by the promises by the undercover agents, and

the individuals recruited had no connection with robberies or distribution of drug

quantities anywhere near the proportions of those proposed by the agents.  The

actions of the government were outrageous and a violation of the Constitutional

protections that appellant Leroy Brooks was entitled to.

A federal court may dismiss a matter when sufficiently serious Government

misconduct renders the prosecution a violation of due process of law. Twigg,

supra, 588 F. 2d at 381.  A defining element of Twigg is the Government's full

responsibility for creating, and indeed concocting, the crime; without the

Government's overture, there would have been no conspiracy.  Id.  The opinion in

Twigg contrasts its facts with cases wherein the criminal plan originates not with

the Government agent or operative but with the defendant.  Id. at 379-80,

(distinguishing United States v. Leja, 563 F. 2d 244 (6th Cir. 1977), because

defendant Leja approached the Government informant with the criminal proposal.)

See also United States v. Smith, 538 F. 2d 1359 (9th Cir. 1976) (rejecting the

outrageous Government misconduct defense because defendant concocted the scheme and began implementing it before the Government became involved).

But, just as in <u>Twigg</u>, the criminal proposal in the present case came wholly from the Government.  Here, the ATF/Government conceived the story and scheme which enticed co-defendants Morales and Santana. There is nothing that shows what, if anything, Leroy Brooks was made aware of.  Clearly, he had no direct conversations with the agents prior to the date of the takedown, and presumably the only information he received was from Morales and Santana.  Without question, there was no conspiracy prior to the government's creation of one.  Further, Leroy Brooks was still asking questions about the proposal at the moment of his arrest.

In <u>Twigg</u>, concededly, the Government investigators provided gear and physical objects needed for the crime; in the present case, the defendants brought their own tools.  But that difference arises from the fact that the present "scheme" involved simply a thought, an idea, a plot, and not the setting up of a facility, whereas in <u>Twigg</u>, the Government's scheme called for setting up a lab facility. The "implements" in the present case were not tangible things, but rather a Government-conjured "opportunity," albeit a fictional one.

The Government level of initiative, instigation and involvement is, however, the same here as in <u>Twigg</u>.  The appellant's eleventh-hour involvement in the

scheme makes him no less a victim of the fictional scheme created by law enforcement. If anything, his lack of early involvement bolsters the fact that the appellant was not a part of any ongoing activity; he was a part of nothing which existed prior to the government's creation of crime.

Cases declining to apply <u>Twigg</u> do not signal <u>Twigg</u>'s demise. <u>See</u>, <u>e.g.</u>, <u>United States v. Nolan-Cooper</u>, 155 <u>F.</u> 3d 221, 230-31 (3d Cir. 1998); <u>United States v. Lakhani</u>, 480 <u>F.</u> 3d 171, 180-81 (3d Cir. 2007); <u>United States v. Beverly</u>, 723 <u>F.</u> 2d 11, 12 (3d Cir. 1983). Salient distinctions from those cases distance each of them from <u>Twigg</u>, and likewise distance them from the present case; indeed, a fair reading of those authorities inferentially illustrates the propriety of applying <u>Twigg</u> in the present case. With the possible exception of <u>Beverly</u>, none of these "Twigg-hostile" cases involved the Government concocting the crime out of whole cloth. The cases that come after <u>Twigg</u> and/or that decline to apply <u>Twigg</u> generally do not involve governmental invention of the whole scheme; they did not involve governmental creating of a crime where otherwise there would be none, solely to win a conviction. <u>See</u> <u>e.g.</u>, <u>Nolan-Cooper</u>, <u>supra</u>, 155 <u>F.</u> 3d at 230-31, 244-45 (Rendell, J, concurring, finding the Government's conduct "reprehensible" but applying the criterion of whether the conduct advanced the investigation and was designed to do so, not sufficient to trigger the due process defense). The cases expressing antipathy to the rule of <u>Twigg</u> do not involve the comprehensive crime

creation that we have in the present case, even while they do involve tactics that the Courts of Appeals have on occasion or in certain respects found disturbing. For example, the Nolan-Cooper court was evaluating a sting wherein the Government agent became involved in a criminal scheme after the target was already committing that criminal conduct. Thus, the Nolan-Cooper court stressed that Twigg did not involve "a situation where an undercover agent [became] involved in the operation after the criminal scheme [was] created," but rather involved circumstances where the agent was responsible for the inception of the unlawful idea in the defendant's mind. Id. at 230.

Of course, in the present case, the Government, through the UCs, similarly planted the idea in Morales' mind, and derivatively into Brooks' mind. But without the UC's overtures, there would have been no conspiracy; the Government produced no evidence at all that Morales, Sananta and Brooks were some kind of pre-existing group involved in robberies and poised for the next caper. In Nolan-Cooper, in contrast, prior to the making of any undercover agent's approach or proposal, initial investigation uncovered evidence through confidential informants that the target had been engaged in money laundering. Thus, the undercover agent approached to obtain evidence of the crime she was already in the course of committing. Indeed, from the opinion, it appears that at the first meeting the target (an attorney) readily offered her "money laundering" services assistance and

confirmed that she had helped plenty of clients to hide or launder money.  Id. at 225.  That undercover agent did not present a scheme that was not like something the target was already engaged in, and this preexisting involvement of the target in money laundering emerges as an arguably controlling fact in the rejection of the outrageous misconduct defense.

The outrageous government conduct defense "examines whether a defendant's due process rights have been violated because the government created the crime for the sole purpose of obtaining a conviction." United States v. Pitt, 193 F. 3d 75l, 759-60 (3d Cir. 1999). In order for the claim to succeed, "a government agent has to initiate the criminal conduct with the goal of obtaining a conviction and must draw the defendant into the illegal activity to bring about that goal.  Id. at 76.  The court must examine whether a defendant's due process rights have been violated.  It is the government's behavior which was created for the sole purpose of obtaining a conviction.

In this case, Leroy Brooks was drawn into a scheme concocted by the federal government agents, which was created for the sole purpose of obtaining a conviction.  Nationwide, the ATF program of creating "a crime" out of a complete fiction based on complete fabrications of an undercover agent has drawn a significant concern from other federal districts. These creative techniques of the ATF have been utilized for the past 10 years.  At least two courts have dismissed

indictments, which were grounded in these outrageous activities. See <u>United States</u>
<u>v. Hudson</u>, No. 2:l3-cr-126-ODW-3 (C.D. Cal 3/10/14); United <u>States v. Joe</u>
<u>Roberts</u>, CR 13-751-R-2, 3, 5 (C.D. Cal 5/30/14).  In 2013, the Ninth Circuit
created a test calling for the review of the totality of the circumstances in cases
where outrageous government conduct has been alleged. The standard that the
court created requires an assessment of the following six considerations:

> 1. Known criminal characteristics of the defendants;

> 2. Individualized suspicion of the defendants;

> 3. The government's role in creating the crime of
> conviction;

> 4. The government's encouragement of the defendants to
> commit the offense conduct;

> 5. The nature of the government's participation in the
> offense conduct; and

> 6. The nature of the crime being pursued and the
> necessity for the actions taken in light of the nature of the
> criminal enterprise at issue.

<u>United States v. Black</u>, 733 <u>F.</u> 3d 294, 304 (9th Cir. 2013).

ln applying the above-listed <u>Black</u> criteria, the government agents had no
idea who Leroy Brooks was and therefore could not know his criminal
characteristics.  There was nothing to indicate that the agents had any knowledge
or awareness of the existence of Brooks.  For the same reason, the government
could not evaluate the individual suspiciousness of Leroy Brooks.  The <u>Black</u>
considerations if applied to Brooks would indicate that there was no basis to be

suspicious of Brooks because they didn't know he existed.

The third factor enunciated by <u>Black</u> as a basis for analysis is the extent of the government's role in creating the crime charged in this case. There is no question in evaluating these facts that the government's role was paramount in that they completely created the crime and further actively encouraged Morales, and then later Santana, to participate by promising them the possibility of great wealth and large quantities of controlled substances. Significantly, the facts are clear that there would be no conspiracy if the government did not invent, participate and encourage these defendants to engage in the conduct charged.

In reviewing the final <u>Black</u> considerations of evaluating the nature of the crime being pursued and the necessity for the government action, it should again be noted that the nature of the crime was that of a total fabrication created by the government. The necessity of the government action in this case was caused by their concoction and the promotion of a fictional robbery. The government was not routing out criminal activity, it was creating it. The activities of the government agents were not about investigating crime, it was about creating and enticing a fictional scenario for the sole purpose of encouraging criminal behavior which would not have existed without the government invention and encouragement.

The outrageous government conduct defense is premised upon the idea that the Constitutional protections of the due process clause limits the conduct of the

government as to how far they can go to investigate crime. <u>United States v. So</u>, 755 F. 2d 1350, 1353 (9th Cir. 1985). The scheme which enticed Morales and Santana was created out of the imagination of confidential sources along with ATF agents. There is nothing in the record that shows what, if anything, Leroy Brooks was made aware of.  Clearly, he had no direct conversations with the agents until the day of the takedown, and presumably the only information he received was from Morales and Santana. Unquestionably, there was no crime prior to the government's creation of one.

A fair reading of the facts in this case would suggest that this matter against Leroy Brooks constituted outrageous government conduct, that the trial court erred in failing to dismiss the charges, and this Court should reverse the holding of the trial court.

### III. THE COURT LACKED JURISDICTION FOR WANT OF EVIDENCE OF EFFECT ON INTERSTATE COMMERCE, AND THE GOVERNMENT FAILED TO PROVE SUCH EFFECT. [As a question of law, the standard of review is plenary/<u>de novo</u>.]

The Third Circuit has held that "the Hobbs Act's required effect on interstate commerce is identical with the requirements of federal jurisdiction under the Commerce Clause." <u>United States v. Walker</u>, 657 F. 3d 160, 179 (3d Cir. 2011) (citation omitted).  If conduct is beyond the power of Congress to proscribe under the Commerce Clause, it is necessarily beyond the reach of the Hobbs Act.

The Commerce Clause gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I § 8, cl. 3.  For such regulation to be valid, there must be an actual link to interstate commerce, not just a speculative possibility.  The government cannot "pile inference upon inference" to arrive at some hypothetical connection to interstate commerce. United States v. Lopez, 514 U.S. 549, 567 (1995); see also id. at 583 (Kennedy, J., concurring) (requiring a "strong[] connection or identification with commercial concerns").  Otherwise, Congress could "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." Id. at 564; see United States v. Morrison, 529 U.S. 598, 617 (2000) ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.")

In addition, the federal government cannot create commerce-affecting activity in order to regulate it.  In National Federation of Independent Business (NFIB) v. Sebelius, 132 S. Ct. 2566 (2012), the Supreme Court explained that Congress does not have "the power to bring the subject of the regulation into existence." Id. at 2586.  Instead, "the power to regulate assumes there is already something to be regulated." Id.  In NFIB, the Court held that the Commerce Clause did not permit the creation of commerce through the Affordable Care

Act's individual mandate, which required that individuals buy health insurance or pay a penalty.  "The individual mandate," the Court explained, "does not regulate existing commercial activity." Id. at 2587.  Instead, it induced individuals "to become active in commerce by purchasing a product." Id. at 2587 (emphasis in original).  The government defended the mandate based on the prediction that most individuals would eventually enter the healthcare market anyway; the Court rejected this attempt to regulate based solely on "prophesied future activity." Id. at 2590; see id. (noting that "we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce," and instead requiring some showing of "preexisting economic activity"). The holding was categorical: Congress can only regulate activity that is already occurring absent federal intervention; it cannot create that activity in the first place.

Likewise, the federal government lacks power to create conspiracies that would have never occurred in the absence of federal intervention.  When a person is not engaged in commerce-impairing conduct, and never will be, the government's creation and punishment of that conduct does not protect interstate commerce in any conceivable way.  There is no federal interest in punishing a person who would never, on his own, have committed the feared conduct. Therefore, to justify the imposition of federal criminal law, the government must

demonstrate to the fact-finder that the defendant was otherwise engaged in the type of conduct at issue. Without that showing, the government has not proven the interstate nexus element of the Hobbs Act because it has not shown that the Commerce Clause reaches the proscribed conduct. Without a showing that an individual was already engaged in the contrived conduct, the government could exercise "the extraordinary ability to create the necessary predicate to the exercise of an enumerated power." NFIB, 132 S. Ct. at 2592.

After NFIB, the Commerce Clause does not allow that. Neither does the Necessary and Proper Clause. If it did, "[n]o longer would Congress be limited to regulating . . . those who by some preexisting activity bring themselves within the sphere of federal regulation. Instead, Congress could reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." Id.  That is not our system of government.

This Court must interpret the Hobbs Act to fit within the bounds of the Commerce Clause.  It would raise grave constitutional doubts to relieve the government of its obligation to prove some conceivable connection to interstate commerce.  This Court must therefore read that element to require proof that the commerce-affecting crime might have happened in the absence of government intervention. See Office of Senator Mark Dayton v. Hanson, 550 U.S. 511, 514

(2007) (describing "our established practice of interpreting statutes to avoid constitutional difficulties").

In sum, while the Commerce Clause is broad, it is not unbounded. A criminal act "cannot be made an offence against the United States, unless it has some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." United States v. Fox, 95 U.S. 670, 672 (1878). The Supreme Court has been crystal clear that the federal government does not have a constitutional role to play in the general suppression of violent crime. See Bond, supra, 134 S. Ct. at 2086; Morrison, supra, 529 U.S. at 618; Jones, supra, 529 U.S. at 858-59; Bass, supra, 404 U.S. at 350. Before it can criminalize conduct, the federal government must make some showing that the conduct is related to the basis for federal jurisdiction. Thus, in a Hobbs Act prosecution, it must show that there is some conceivable threat to interstate commerce in the absence of government intervention. Any other rule would give the federal government "the power to bring the subject of the regulation into existence," and it would ignore that "the power to regulate assumes there is already something to be regulated." NFIB, supra, 132 S. Ct. at 2586.

The government must prove the interstate commerce nexus in every case. It has not done so where there is no proof that the appellant might have committed the relevant crime without government intervention.

IV.   THE COURT SHOULD HAVE APPLIED A TWO-
LEVEL MINOR ROLE ADJUSTMENT WITH REGARD TO
THE DRUG CONSPIRACY PURSUANT TO §3B1.2(a) OF
THE FEDERAL SENTENCING GUIDELINES. [As a question
of law, the standard of review is plenary/<u>de novo</u>.]

The appellant's only role in the conspiracy to distribute cocaine was his

participation in the conspiracy to commit the Hobbs Act robbery.  There was no

evidence what role the appellant would have played once the non-existent cocaine

was stolen from the stash house.  The appellant had no history of distribution of

large amounts of cocaine.  While the appellant does have prior convictions

involving controlled dangerous substances, the most serious of his offenses were

for third degree possession with intent to distribute cocaine within 1000 feet of a

school. (A.957)  No cutting agents, scales or other tools of the drug trade were

discovered in connection to Brooks.  There is no indication of what specific

amount of cocaine he would receive in connection with the robbery.  In fact, he

was not present during the meeting in which the split was discussed.  During that

June 10th meeting, the agent agreed to take five kilos, and Santana and Morales

were to receive 10 kilos.  Brooks' only participation in the conspiracy to distribute

cocaine was his purported role in the Hobb's Act Robbery.  For these reasons, the

appellant should have been deemed a minor participant in conspiracy to distribute

cocaine, and was entitled to a two-level downward adjustment for Count Two

pursuant to §3B1.2(a).

V.     THE APPELLANT'S MOTION TO VACATE
HIS CONVICTION OF VIOLATION OF CARRYING
A FIREARM IN FURTHERANCE OF A CRIME OF
VIOLENCE UNDER 18 U.S.C. § 924(c) SHOULD
HAVE BEEN GRANTED. [As a question of law, the
standard of review is plenary/de novo.]

In addition to two conspiracies (Hobbs Act robbery and drug distribution),

appellant Leroy Brooks was indicted in a Superseding Indictment for a violation of

18 U.S.C. § 924(c), carrying a firearm in furtherance of conspiracy to commit

robbery and conspiracy to distribute and possess with intent to distribute cocaine.

Count 4[4] of the Superseding Indictment charged appellant with carrying a firearm

during the commission of a crime of violence *and* during the commission of a drug

trafficking crime.  Brooks was convicted of carrying a firearm in furtherance of a

crime of violence *or* drug offense in violation of 18 U.S.C. § 924(c)(1)(A)(ii)

(Count 4).

A.  The Jury Verdict Was Ambiguous: It Was
Unknown Whether the Jury Found the Appellant
Guilty of Carrying a Firearm in Furtherance of a
Hobbs Act Robbery Conspiracy or Carrying a
Firearm in Furtherance of a Drug Conspiracy.

18 U.S.C. § 924(c) provides that any person who, during and in relation to

any crime of violence or drug trafficking crime, uses or carries a firearm, shall

---

[4] The jury verdict sheet refers to this count as Count 3 because the trial of the Felon
in Possession count was severed and presented to the jury at a separate trial
immediately after their verdict on the other counts.

receive a five-year mandatory-minimum sentence, with seven- and ten-year minimums applicable, respectively, if the firearm is also brandished or discharged. 18 U.S.C. § 924(c)(1)(A).

The jury was presented with two possible findings: 1) that the defendant carried the firearm in furtherance of a crime of violence, *or* 2) that the defendant carried the firearm in furtherance of a drug trafficking crime. The verdict, as written, left questionable which constituted the underlying crime: the robbery conspiracy or the drug conspiracy. There was no determination by the jury (and the verdict sheet does not seek a determination) as to which underlying offense the jury had found: the robbery conspiracy or the drug conspiracy. Therefore, the jury's verdict was ambiguous.

Therefore, the jury's verdict could have been that the appellant carried the firearm in furtherance of the robbery conspiracy, only, and not in furtherance of the drug conspiracy. Because of that possibility, and for the following reasons, the § 924(c) conviction must be vacated.

### B. The Hobbs Act Robbery Under § 1951(b) Did Not Qualify as a "Crime of Violence" Under the Force Clause of § 924(c)(3) Because It Can Be Committed Without the Use, Attempted Use, or Threatened Use of Violent Physical Force.

Appellant's conviction under § 924(c) must be vacated in light of the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015).

40

Appellant submits that his § 924(c) conviction must be vacated because conspiracy to commit Hobbs Act robbery does not qualify as a "crime of violence."

In Johnson, the Supreme Court struck down the residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii), as unconstitutionally vague. 135 S. Ct. 2551, 2557 (2015). Johnson applies to § 924(c) convictions as well, and certainly those which depend on § 924(c)(3)(B), the "residual clause" definition. See Freeman v. United States, No. 15-3687 (2d Cir. January 26, 2016) (granting motion for leave to file successive §2255 petition where petitioner was convicted under 18 U.S.C. § 924(c)(1)(A)(iii) based on a conspiracy to commit Hobbs Act robbery); Ruiz v. United States, No. 16-1193 (7th Cir. February 19, 2016). In Ruiz, the Government conceded the petitioner's "ability to make a prima facie showing that his convictions [under § 924(c)] were based on the definition of a crime of violence in 18 U.S.C. § 924(c)(3)(B), which is similar to the residual clause of the Armed Career Criminal Act. Although the Government argued that § 924(c)(3)(B) "differ[ed] enough from the ACCA's residual clause that it was not invalidated by Johnson," the court found that § 924(c)(3)(B) was "identical to 18 U.S.C. § 16(b), which we held is unconstitutionally vague under Johnson." Ruiz Order in No. 16-1193, citing United States v. Vivas-Ceja, 808 F.3d 719 (7th Cir. 2015).

41

§ 924(c)(3) defines "crime of violence" to mean any felony that either "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the elements or force clause), or, "by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the residual clause). § 924(c)(3)'s residual clause can no longer be used to find that any crime, including conspiracy to commit Hobbs Act robbery, is a crime of violence.  It is unconstitutionally vague on its face and, therefore, has been a nullity since enacted.

Johnson held that the residual clause of § 924(e)'s "violent felony" definition was unconstitutionally vague on its face, and the vagueness came from having to assess the "risk" posed in an "ordinary case" under the statute defining the predicate offense.  Johnson, supra, 135 S. Ct. at 2557-2558; James v. United States, 550 U.S. 192, 208 (2007) (adopting "ordinary case" standard for assessing residual clause risk).   § 924(c)'s residual clause similarly turns on the "risk" posed in the "ordinary case" of the predicate offense.  Since cases involving § 924(e) are equally applicable to cases arising under § 924(c), Johnson's reasoning compels ruling that § 924(c)'s residual clause is just as unconstitutionally vague as is § 924(e)'s residual clause.

The Third Circuit has invalidated the Guidelines' residual clause as unconstitutionally vague after Johnson.  United States v. Townsend, No. 14-3652,

2015 <u>WL</u>9311394, at \*4 & n.14 (3d Cir. Dec. 23, 2015) ("We are guided, in this case, by our own circuit precedent interpreting the residual clauses in the Guidelines and the ACCA in light of their identical wording and by the Government's concession that Townsend should be resentenced.). Other courts have accepted that <u>Johnson</u> applies and have remanded for resentencing. <u>See</u>, <u>e.g.</u>, <u>United States v. Maldonado</u>, No. 12-3487-cr, 2016 WL229833, at \*3 (2d Cir. Jan. 20, 2016) (proceeding "on the assumption that the Supreme Court's reasoning with respect to the ACCA's residual clause applies to the identically worded Guideline § 4B1.2(a)(2)'s residual clause"); <u>Ramirez v. United States</u>, 799 <u>F.</u> 3d 845, 856 (7th Cir. 2015)(same); <u>United States v. Taylor</u>, 803 <u>F.</u> 3d 931 (8th Cir. 2015) (<u>per curiam</u>).

To determine whether a predicate offense qualifies as a "crime of violence" under § 924(c), courts use the categorical approach, which requires that they "look only to the statutory definitions – <u>i.e.</u>, the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." <u>Descamps v. United States</u>, 135 <u>S. Ct.</u> 2551, 2283 (2013). Further, "[u]nder the categorical approach, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." <u>Johnson</u>, <u>supra</u>, 135 <u>S. Ct.</u> at 2557 (citation omitted). In

other words, an act of physical force must be an element of the offense. The

Supreme Court has held that "physical force" in this context means "violent force"

– that is "strong physical force," which is "capable of causing physical pain or

injury to another person." Johnson v. United States, 559 U.S. 133, 140 (2010)

The Courts of Appeals have further elucidated this approach. The Fourth

Circuit determined that the categorical approach, "look[s] only to the statutory

definition of the state crime and the fact of conviction to determine whether the

conduct criminalized by the statute, including the most innocent conduct, qualifies

as a 'crime of violence.'" United States v. Torres-Miguel, 701 F. 3d 165, 167 (4th

Cir. 2012).  In other words, a predicate offense is only a "crime of violence" if, as

defined by its statute, its commission necessarily involves an act of physical force.

Torres-Miguel dealt with the defendant's prior conviction for the offense of

willfully threatening to commit a crime that "will result in death or great bodily

injury to another" under Cal. Penal Code § 422(a)), and whether the statute had an

element equating to a threat of "violent force" under the force clause of U.S.S.G. §

2L1.2 – a clause that is identical in all relevant respects to the § 924(c)(3)(A) force

clause.  Despite the "death or great bodily injury" element in the California statute,

the Fourth Circuit found that the offense was missing a "violent force" element,

and thus could never qualify as a "crime of violence" under the force clause. Id. at

168-69.  The Court held that "[a]n offense that results in physical injury, but does

not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." Id. at 168.

The Tenth Circuit similarly held that C.R.S. § 18-3-204, a Colorado statute defining third degree assault as "knowingly or recklessly caus[ing] bodily injury to another person or with criminal negligence [causing] bodily injury to another person by means of a deadly weapon," is not a crime of violence under U.S.S.G. § 2L1.2 because, while the offense necessarily results in bodily injury, the means of injury did not require the use or threatened use of physical force.  United States v. Perez-Vargas, 414 F. 3d 1282 (10th Cir. 2005).  The court held "the statutory language of Colorado's third degree assault statute does not necessarily include the use or threatened use of "physical force" as required by the Guidelines. A prior conviction for third degree assault in Colorado, therefore, is not categorically a crime of violence under U.S.S.G. § 2L1.2." Id. at 1287.

The Second Circuit held that a similar statute for third degree assault in Connecticut does not qualify as a crime of violence under the force clause either. Chrzanoski v. Ashcroft, 327 F. 3d 188 (2d Cir. 2003).  The statute in question only required proof of causation of physical injury, meaning that physical force was not a necessary element of the offense. The court refused to equate causation of physical injury with physical force, holding "there are many crimes that involve a substantial risk of injury but do not involve the use of force. Crimes of gross

negligence or reckless endangerment, such as leaving an infant alone near a pool, involve a risk of injury without the use of force." Id. at 194-95 (quoting Dalton v. Ashcroft, 257 F. 3d 200, 208 (2d Cir. 2001)).

Finally, the Fifth Circuit decided United States v. Gracia-Cantu, 302 F. 3d 308 (5th Cir. 2002) much the same way, determining that Tex. Penal Code Ann.§ 22.04(a), criminalizing the "intentional, knowing, reckless or negligent causation of serious bodily injury to a child," was not a crime of violence under the force clause. The court noted that the offense of causing injury to a child often did not require any affirmative action at all, let alone the use of violent force. Id. at 312. The court then cited a variety of cases where the statute had merely been violated by an omission: a child left unattended near a pool, failure to rescue a child during a kidnapping, and failure to seek the proper medical care for a child. Id. at 312-313. The variety of examples illustrated that the statute could be violated in ways that did not require the use of violent force, and therefore "the offense is not, 'by its nature,' a crime of violence . . ." Id. at 313.

This line of precedent indicates that under the categorical approach to § 924(c)(3)'s force clause, only a crime necessarily involving an act of physical force qualify as a "crime of violence."  Hobbs Act robbery, as defined by § 1951, does not meet this requirement because it can be accomplished by putting someone in

fear of future injury to his person or property, and thus does not necessarily involve the use, attempted use, or threatened use of "violent force."

Hobbs Act robbery is defined as the "taking by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time . . . ." 18 U.S.C. §1951(b). Like the statutes in the cases cited above, Hobbs Act robbery may be committed without the use or threat of violent physical force. Rather, the crime may be completed by threatening to injure the person or property of another. This does not require a threat of force, let alone violent physical force as required by Johnson, supra, 559 U.S. at 140.

"There is a 'difference between the causation of an injury and an injury's causation by the 'use of physical force.'" Chrzanoski, supra, 327 F. 3d at 194. Causing injury to another person or his property does not necessarily involve the use of violent physical force against a person or property. There are myriad ways a person can place another in fear of injury without threatening physical violence at all, such as by threatening to poison another. See Torres-Miguel, supra, 701 F. 3d at 168.

Because "the full range of conduct" covered by the Hobbs Act robbery statute does not require "violent force," it cannot qualify as a "crime of violence"

47

under § 924(c)(3)'s force clause. The likelihood of the offense being committed without the use of violent force is irrelevant. Because the possibility exists, this Court cannot legally find that Hobbs Act robbery is a "crime of violence."

Because § 924(c)'s residual clause is unconstitutionally vague on its face, it may not be used to find that a conspiracy to commit Hobbs Act robbery is a crime of violence.  Thus, the only remaining question here is whether the defendant's underlying conviction for conspiracy to commit Hobbs Act robbery qualifies as a "crime of violence" under the "force" clause of § 924(c)(3)(A), requiring the court to sentence him to a consecutive term of 5 years.  Appellant respectfully contends that it does not qualify as a "crime of violence" under the force clause because it (1) does not have as an element the use, attempted use, or threat of violent physical force, and/or (2) does not require the intentional use, attempted use, or threatened use of violent physical force.

i.  Section 924(c)(3)'s Residual Clause is Unconstitutionally Vague and Cannot Support a Conviction Under the Statute.

Because Hobbs Act robbery fails to qualify as a "crime of violence" under § 924(c)(3)(A), the force clause, the remaining question is whether the offense can qualify as a "crime of violence" under § 924(c)(3)(B), the residual clause.

In Johnson, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior

48

convictions as violent felonies is too "wide-ranging" and "indeterminate."

Johnson, supra, 135 S. Ct. at 2557.  As a result, that clause of the ACCA "both

denies fair notice to defendants and invites arbitrary enforcement by judges." Id.

Johnson concluded that the Supreme Court's four previous attempts to articulate a

workable test to determine whether a felony falls under the ACCA residual clause

had failed, and "this Court's repeated attempts and repeated failures to craft a

principled and objective standard out of the residual clause confirm its hopeless

indeterminacy." Id. at 2558-59.

The Court explained that under Taylor v. United States, 495 U.S. 575

(1990), the court applies the categorical approach to determine whether a prior

conviction qualifies as a crime of violence under the ACCA. Johnson, supra, 135

S. Ct. at 2557.  Courts must assess whether a crime qualifies as a violent felony "in

terms of how the law defines the offense and not in terms of how an individual

might have committed it on a particular occasion." Id., quoting Begay v. United

States, 553 U.S. 137, 141 (2008).  Moreover, a court undertaking an analysis of an

offense under the residual clause was required "to picture the kind of conduct that

the crime involves 'in the ordinary case,' and to judge whether that abstraction

presents a serious risk of potential injury." Id., citing James, supra, 550 U.S. at

208.  Specifically, the "ordinary case" approach involved an inquiry into "whether

the conduct encompassed by the elements of the offense, in the ordinary case,

presents a serious potential risk of injury to another." Id. (citations omitted). "As long as the offense is of a type that, by its nature, presents a serious risk of injury to another," it would be found to satisfy "the requirements of [the ACCA's] residual clause." Id. at 209.

In Johnson, the Court acknowledged that favoring judicially-invented abstractions over real world facts was a fatally flawed approach. With no alternative to the ordinary case approach, the Court held that the ACCA's residual clause was unconstitutionally vague. The Johnson Court found numerous problems with the ordinary case approach: "Grave uncertainty" surrounds the method of "determin[ing] the risk posed by the "judicially imagined 'ordinary case.'" Johnson, supra, 135 S. Ct. at 2557. "The residual clause offers no reliable way to choose between . . . competing accounts of what 'ordinary'…involves." Id. at 2558.

The Court in Johnson specifically retreated from its most recent attempts to clarify the ordinary case approach in ACCA cases, Chambers v. United States, 555 U.S. 122 (2009), and Sykes v. United States, 564 U.S. 1 (2011), which relied on statistical analysis and "common sense" respectively. In Johnson, the Court concluded that these methods "failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition." Id. at 2559.

This flaw is exacerbated by the residual clause's lack of a meaningful gauge for determining when exactly the risk posed by the offense underlying the modification is enough to constitute a "serious potential risk of physical injury." Id. at 2558.  The statute enumerates several offenses for guidance (burglary, arson, extortion, or crimes involving use of explosives), but in Johnson, the Court rejected that tethering the "serious potential risk" language to certain enumerated offenses somehow solved the constitutional problem. Id.

This comparative approach suffers from the same problem as the general "ordinary case" approach; it requires "a judicially imagined abstraction" to determine the risk of physical injury.  Id.  In order to compare the crime at issue to one of the enumerated offenses, the judge is required to imagine an "ordinary" case of, for example, burglary, and determine if the defendant's conduct matches up. But the "ordinary" enumerated crimes like any other crime, "are far from clear in respect to the degree of risk each poses." Id. (citation omitted).  Any attempt to figure out the "ordinary" enumerated offense requires just as much guesswork as figuring out the "ordinary" predicate offense. The Court held that such an analysis "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." Id.  Johnson not only invalidated the ACCA residual clause, but it invalidated the "ordinary case" analysis and statutory provisions that compel such an analytical framework.

Had the appellant been charged solely with § 924(c) in furtherance of the drug conspiracy offense, then <u>Johnson</u> offers no help to the appellant and he would not have grounds for this argument.  However, because the verdict sheet was presented in the alternative, we do not know of which underlying crime the jury found the § 924(c) violation to further: the conspiracy to commit a violent felony (robbery) or the drug conspiracy charge.  Because of the possibility that the jury found that the appellant carried a firearm *only* in furtherance of a violent felony, then <u>Johnson</u> and <u>Townsend</u> apply.

For all of the aforementioned reasons, appellant's underlying conviction for conspiracy to commit Hobbs Act robbery no longer qualifies as a "crime of violence," and Mr. Brooks should not have been subjected to a consecutive sentence under § 924(c)(1)(A).  Therefore, appellant's conviction for violation of § 924(c) should be vacated.

## CONCLUSION

For all of the foregoing reasons, appellant's convictions should be reversed, the indictment should be dismissed, or, in the alternative, the matter should be remanded for re-sentencing with the appellant granted a two-level downward adjustment for minor role in the drug trafficking conspiracy conviction.

Respectfully submitted,

Dated: August 31, 2017

RICHARD SPARACO, ESQ.

52

## CERTIFICATION OF ADMISSION TO PRACTICE

I, Richard Sparaco, hereby certify that I am an attorney in the District of New Jersey and am entitled to practice before the United States Court of Appeals for the Third Circuit.

Dated: August 31, 2017

_____
RICHARD SPARACO, ESQ.

## CERTIFICATE OF COMPLIANCE

I, Richard Sparaco, hereby certify that:

1. I am an attorney licensed to practice in the United States Third Circuit Court of Appeals.

2. On behalf of the Appellant, I am electronically filing the attached Appellant's Opening Brief and Appendices.

3. I hereby certify that this Brief complies with the type and volume limitations set forth in Fed. R. App. P.  32(a)(7). This Brief complies with the typeface requirements of Fed. R. App. P.  32(a)(5) and the type requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared using a proportionally spaced typeface using Microsoft Word with 14-point font. According to the word count feature of Microsoft Word, this Brief contains

53

12,142 words, excluding those parts exempted by <u>Fed. R. App. P.</u> 32(f). The text of the electronic version of this Brief and the attached Appendix is identical to the text in the paper copies. TotalAV virus-scan for Mac, Version 1.13, has been run on the files, and no virus was detected.

I certify that the foregoing statements made by me are true. I am aware that if any statement made by me is willfully false that I am subject to punishment.

Dated: August 31, 2017

RICHARD SPARACO, ESQ.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 31, 2017, I caused the foregoing Brief and attached Appendix to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, and arranged to have seven (7) paper copies of the Brief with Appendix Volume I attached, and four (4) paper copies of the Appendix Volumes II through VI to be delivered within five (5) days of the date of filing to:

Marcia Waldron
The Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106-1790

I hereby certify that on August 31, 2017, I caused the foregoing Brief and Appendices to be served upon counsel of record for Appellee through the Notice of Docketing Activity issued by this Court's CM/ECF system.

Dated: August 31, 2017

RICHARD SPARACO, ESQ.

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA,   : APPELLATE DOCKET NUMBER
                            : 17-1681

    Appellee,               :
                            :
    -v-                     :
                            :
LEROY BROOKS                :
                            :
    Appellant.              :   ELECTRONICALLY FILED
_____

ON APPEAL FROM A FINAL JUDGMENT
OF CONVICTION AND SENTENCE OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.N.J. CRIMINAL NO. 11-783 (04) (RMB))
_____

APPELLANT'S OPENING APPENDIX VOLUME I of VI (Pages 1-6)
_____

RICHARD SPARACO, ESQ.
Bar ID# 021291981
1920 Fairfax Ave.
Cherry Hill, NJ 08003
856-751-8888; rsparaco@me.com
Attorney for Appellant

## APPENDIX TABLE OF CONTENTS

Volume I of VI (Pages A.1-A.6)

Judgment of Conviction and Sentence filed 3/27/2017 [Document 128] ......... A.1-5

Notice of Appeal filed 3/28/2017 [Document 129] ............................................. A.6


Volume II of VI (Pages A.7-A.236)

Criminal Docket Entries ....................................................................................... A.7

Superseding Indictment filed 6/3/2015 [Document 57]    ................................. A.25

Appellant's Motion to Dismiss (Outrageous Government Conduct) filed
10/27/2014 [Document 32] ................................................................................ A.30

Appellant's Motion for Hearing and Discovery Regarding Racial Pro filed
10/27/2014 [Document 32] ................................................................................ A.40

Appellant's Motion to Dismiss (Lack of Subject Matter Jurisdiction) filed
5/27/2015 [Document 51] .................................................................................. A.43

Appellant's Motion for Production of 404(b) Materials .................................... A.69

Appellant's Motion to Obtain Discovery from the Government to Raise the Issues
of Selective Prosecution and Racial Profiling filed 5/27/15 [Document 56] ...... A.74

Appellant's Supplemental Motion to Obtain Discovery from the Government to
Raise the Issues of Selective Prosecution and Racial Profiling filed 6/10/15
[Document 58] ................................................................................................... A.90

Supplemental Opinion on Motion to Suppress [Document 81] ......................... A.93

Order on Motion to Dismiss for Lack of Jurisdiction entered 10/27/15 [Document
82] ................................................................................................................... A.102

Jury Verdict Sheet [Document 107] ............................................................... A.105

Supplemental Jury Verdict Sheet [Document 109] .......................................... A.108

Motion for New Trial [Document 115] ............................................................ A.109

Motion to Vacate Convictions [Document 121] .............................................. A.116

Order Dismissing Original Indictment [Document 134] .................................. A.139


Volume III of VI (Pages A.237-A.480)

Trial Transcript – January 11, 2016 .................................................................. A.237

Trial Transcript – January 12, 2016 .................................................................. A.276


Volume IV of VI (Pages A.481-A.723)

Trial Transcript – January 13, 2016 .................................................................. A.481


Volume V of VI (Pages A.724-A.903)

Trial Transcript – January 14, 2016 .................................................................. A.724

Trial Transcript – January 19, 2016 .................................................................. A.870


Volume VI of VI (Pages A.904-A.1122)

Motions and Sentencing Transcript – March 17, 2017 ..................................... A.904

Sentencing Transcript – March 24, 2017 ......................................................... A.1001

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

v.

**CASE NUMBER   1:14-CR-00382-RMB-2**

LEROY BROOKS

Defendant.

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, LEROY BROOKS, was represented by RICHARD SPARACO, ESQUIRE.

The defendant was found guilty on all counts by a jury verdict on January 19, 2016 after a plea of not guilty.  Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Commit Robbery (Hobbs Act Robbery) | that from on or about June 4, 2013 through on or about June 18, 2013 | 1s |
| 21 U.S.C. § 846 [21 U.S.C. § 841(a)(1) and 841(b)(1)(A)] | Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms or more of Cocaine | that from on or about June 4, 2013 through on or about June 18, 2013 | 2s |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm | that from on or about June 18, 2013 | 3s |
| 18 U.S.C. § 924(c)(1)(A)(i) | Carrying Firearms During and in Relation to a Crime of Violence or Drug Trafficking Offense | that on or about June 18, 2013 | 4s |

As pronounced on March 27, 2017, the defendant is sentenced as provided in pages 2 through 5 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must pay to the United States a special assessment of $100.00 on Count One, $100.00 on Count Two, $100.00 on Count Three and $100.00 on Count Four, for a total of $400.00, which shall be due immediately.  Said special assessment shall be made payable to the Clerk, U.S. District Court.

It is further ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in economic circumstances.

Signed this 27th day of March, 2017.

Renée Marie Bumb
U.S. District Judge

Judgment - Page 2 of 5

Defendant: LEROY BROOKS
Case Number: 1:14-CR-00382-RMB-2

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 270 months. This sentence consists of 210 months on Count One, 210 months on Count Two, and 120 months on Count Three, all such terms to be served concurrently; and a term of 60 months on Count Four, to be served consecutively to each of Counts One, Two, and Three, to the extent necessary to produce a total term of imprisonment of 270 months.

The Court makes the following recommendations to the Bureau of Prisons:

1.  The Court recommends that the Bureau of Prisons designate a facility for service of this sentence as near as possible to the defendant's home address at Fort Dix, New Jersey.

2.  The defendant will remain in custody pending service of sentence.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ To _____

At _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

**A.2**

Defendant: LEROY BROOKS
Case Number: 1:14-CR-00382-RMB-2

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of 5 years. 5 years with conditions. This term consists of 3 years on each of Counts One and Three, and terms of 5 years on Counts Two and Four, all such terms to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, you must report in person to the Probation Office in the district to which you are released.

While on supervised release, you must not commit another federal, state, or local crime, must refrain from any unlawful use of a controlled substance and must comply with the mandatory and standard conditions that have been adopted by this court as set forth below.

You must submit to one drug test within 15 days of commencement of supervised release and at least two tests thereafter as determined by the probation officer.

You must cooperate in the collection of DNA as directed by the probation officer

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it is a condition of supervised release that you pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release and must comply with the following special conditions:

ALCOHOL/DRUG TESTING AND TREATMENT

You must refrain from the illegal possession and use of drugs, including prescription medication not prescribed in your name, and the use of alcohol, and must submit to urinalysis or other forms of testing to ensure compliance. It is further ordered that you must submit to evaluation and treatment, on an outpatient or inpatient basis, as approved by the U.S. Probation Office. You must abide by the rules of any program and must remain in treatment until satisfactorily discharged by the Court. You must alert all medical professionals of any prior substance abuse history, including any prior history of prescription drug abuse. The Probation Office shall supervise your compliance with this condition.

LIFE SKILLS/EDUCATION

As directed by the U.S. Probation Office, you must participate in and complete any educational, vocational, cognitive or any other enrichment programs offered by the U.S. Probation Office or any outside agency or establishment while under supervision.

MOTOR VEHICLE COMPLIANCE

You must not operate any motor vehicle without a valid driver's license issued by the State of New Jersey, or in the state in which you are supervised. You must comply with all motor vehicle laws and ordinances and must report all motor vehicle infractions (including any court appearances) within 72 hours to the U.S. Probation Office.

SUPPORTING DEPENDENTS

If you are Court-ordered to make child support payments or to make payments to support a person caring for a child, you must make the payments and comply with the other terms of the order.

**A.3**

Defendant: LEROY BROOKS
Case Number: 1:14-CR-00382-RMB-2

Judgment - Page 4 of 5

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4) You must answer truthfully the questions asked by your probation officer.

5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have fulltime employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e.. anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

**A.4**

AO 245B (Mod. DNJ 12/06) Sheet 3a - Supervised Release

Defendant: LEROY BROOKS
Case Number: 1:14-CR-03382-RMB-2

Judgment - Page 5 of 5

## STANDARD CONDITIONS OF SUPERVISION

13) You must follow the instructions of the probation officer related to the conditions of supervision.

---

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions, and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed)_____

Defendant                                                          Date

_____

U.S. Probation Officer/Designated Witness                          Date

---

**A.5**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
(Camden Vicinage)

_____

UNITED STATES OF AMERICA          : CRIMINAL NO. 14-382 (RMB)

v.                                :

LEROY BROOKS                      :

_____

_____

NOTICE OF APPEAL TO THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Notice is hereby given that the defendant, LEROY BROOKS, hereby appeals to the United States Court of Appeals for the Third Circuit from the Judgment of Conviction and Sentence entered on March 27, 2017.

The defendant hereby requests appointment of counsel pursuant to the Criminal Justice Act based on his indigence, as the defendant/appellant was previously appointed counsel in this matter in the District Court pursuant to the Criminal Justice Act.

Dated: March 28, 2017          _____
                               RICHARD SPARACO, ESQ.
                               Bar ID#021291981
                               1920 Fairfax Ave.
                               Cherry Hill, New Jersey 08003-2007
                               (856) 751-8888
                               Email: rsparaco@me.com
                               Attorney for Defendant, Brooks

**A.6**