No. 17-1681

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA

v.

LEROY BROOKS,

Appellant

Appeal from a Final Judgment in a Criminal Case of the United
States District Court for the District of New Jersey (Crim. No. 14-
382).   Sat Below: Honorable Renée Marie Bumb, U.S.D.J.

---

BRIEF FOR APPELLEE

---

WILLIAM E. FITZPATRICK
Acting United States Attorney
Attorney for Appellee
970 Broad Street
Newark, New Jersey 07102-2535
(973) 645-2700

On the Brief:

STEVEN G. SANDERS
Assistant U.S. Attorney
(973) 645-2846

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iv

TABLE OF ABBREVIATIONS.................................................................. xi

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF RELATED CASES ....................................................... 2

STATEMENT OF THE CASE .................................................................... 2

I.  THE FACTS. ........................................................................................... 2

    A.  Introduction ................................................................................. 2

    B.  The Reverse Sting ....................................................................... 3

        1.  The June 4th Meeting ........................................................ 3

        2.  The June 10th Meeting ...................................................... 4

        3.  The June 14th Meeting....................................................... 5

        4.  The June 18th Takedown ................................................... 6

II.  PROCEDURAL HISTORY. ...................................................................... 8

    A.  The Indictment ............................................................................ 8

    B.  The Pretrial Motions ................................................................... 9

    C.  The Trial ...................................................................................... 10

    D.  The Verdict .................................................................................. 11

    E.  The Post-Trial Motion ................................................................ 11

    F.  The Sentence ................................................................................ 12

SUMMARY OF ARGUMENT ................................................................... 14

ARGUMENT ........................................................................ 15

I.   Although The District Court Erred In Applying *United States v. Armstrong*, 517 U.S. 456 (1996), To Brooks's Motion For Discovery Supporting A Selective Enforcement Claim, Brooks Has Failed To Show That This Error Affected His Substantial Rights Or Would Work A Miscarriage Of Justice If Not Corrected On Appeal. ........................................................................... 15

     A.   Brooks Must Show Plain Error. .............................. 16

     B.   Brooks Can Show A Plain Error. ............................. 18

     C.   Brooks Has Failed To Show That Any Error Affected His Substantial Rights Or That Denying Him A Remedy Will Work A Miscarriage Of Justice.................................. 19

     D.   Conclusion ............................................................ 24

II.  The District Court Correctly Rejected Brooks's Claim Of Outrageous Government Conduct. ...................................... 25

III. Third Circuit Precedent Required The District Court To Reject Defendant's Claim That There Was Insufficient Evidence To Prove That The Hobbs Act Conspiracy, Had It Achieved Its Object, Would Have Affected Interstate or Foreign Commerce........... 31

IV.  Any Alleged Error In Denying A Minor-Role Reduction Is Entirely Academic Given Brooks's Career Offender Status. In Any Event, Brooks Fails To Show Clear Error. ......................... 35

V.   The Invited Error Doctrine Bars Brooks From Arguing On Appeal That Conspiracy To Commit Hobbs Act Robbery Is Not A Crime Of Violence. In Any Event, Brooks Cannot Show Plain Error Because Third Circuit Precedent Forecloses His Claim....................... 40

     A.   The Invited-Error Doctrine Bars Brooks's Claim. ...................... 40

     B.   Brooks Cannot Show Plain Error Because *United States v. Robinson* Forecloses His Claim. ................................. 42

CONCLUSION...................................................................... 49

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    <u>Page(s)</u>

*Beckles v. United States*,
   137 S. Ct. 886 (2017) ................................................................. 48

*Charles v. Artuz*,
   21 F. Supp. 2d 168 (E.D.N.Y. 1998)........................................... 23

*Finberg v. Sullivan*,
   658 F.2d 93 (3d Cir. 1980) ......................................................... 35

*Henderson v. United States*,
   568 U.S. 266 (2013) .................................................................... 19

*In re Hoffner*,
   870 F.3d 301 (3d Cir. 2017)........................................................ 48

*Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths,*
*Forgers & Helpers v. Kelly*,
   815 F.2d 912 (3d Cir. 1987)........................................................ 35

*Johnson v. United States*,
   135 S. Ct. 2551 (2015)...........................................................40, 43

*Johnson v. United States*,
   559 U.S. 133 (2010) .................................................................... 43

*National Federation of Independent Business v. Sebelius*,
   567 U.S. 519 (2012) .................................................................... 33

*Powell v. McCormack*,
   395 U.S. 486 (1969) .................................................................... 35

*Puckett v. United States*,
   556 U.S. 129 (2009) .................................................................... 17

*Shields v. United States*,
   273 U.S. 583 (1927) .................................................................... 40

*Stirone v. United States*,
   361 U.S. 212 (1960) .................................................................... 31

*Taylor v. United States,*
   136 S. Ct. 2074 (2016)................................................................ 31, 32, 33

*Taylor v. United States,*
   495 U.S. 575 (1990) ...................................................................... 43

*U.S. Parole Comm'n v. Geraghty,*
   445 U.S. 388 (1980) ...................................................................... 35

*United States v. Alcaraz-Arellano,*
   441 F.3d 1252 (10th Cir. 2006)..................................................... 18

*United States v. Andrews,*
   681 F.3d 509 (3d Cir. 2012).......................................................45, 46

*United States v. Armstrong,*
   517 U.S. 456 (1996) ..............................................................*passim*

*United States v. Avery,*
   137 F.3d 343 (6th Cir. 1997) ........................................................ 22

*United States v. Bailey,*
   227 F.3d 792 (7th Cir. 2000) ........................................................ 32

*United States v. Beason,*
   238 F. App'x 854 (3d Cir. 2007) ................................................... 37

*United States v. Benjamin,*
   711 F.3d 371 (3d Cir. 2013).......................................................... 19

*United States v. Beverly,*
   723 F.2d 11 (3d Cir. 1983) .........................................................26, 30

*United States v. Brennan,*
   326 F.3d 176 (3d Cir. 2003).......................................................... 42

*United States v. Calabretta,*
   831 F.3d 128 (3d Cir. 2016).......................................................... 48

*United States v. Calloway,*
   571 F. App'x 131 (3d Cir. 2014) ................................................... 42

*United States v. Colon,*
   71 F. Supp. 3d 269 (D. Conn. 2014) ............................................. 28

v

*United States v. Combs*,
827 F.3d 790 (8th Cir. 2016) ................................................................ 28

*United States v. Cotton*,
535 U.S. 625 (2002) ............................................................................. 21

*United States v. Davis,*
793 F.3d 712 (7th Cir. 2015) ..................................................... 16, 18, 23

*United States v. Dennis*,
826 F.3d 683 (3d Cir. 2016)......................................................... 25, 26, 29

*United States v. Driscoll*,
852 F.2d 84 (3d Cir. 1988) .................................................................. 29

*United States v. Duka*,
671 F.3d 329 (3d Cir. 2011)................................................................. 46

*United States v. Fattah*,
858 F.3d 801 (3d Cir. 2017)................................................................. 30

*United States v. Graham*,
Crim. No. 12-418, 2014 WL 4105978 (E.D. Pa. Aug. 21, 2014)...........26, 27

*United States v. Hare*,
820 F.3d 93 (4th Cir. 2016) .............................................................28, 47

*United States v. Hastings*,
134 F.3d 235 (4th Cir. 1998) ............................................................... 47

*United States v. Hedaithy*,
392 F.3d 580 (3d Cir. 2004).................................................................. 22

*United States v. Hubbell*,
667 F. App'x 887 (8th Cir. 2016) ........................................................... 36

*United States v. Hullaby*
736 F.3d 1260 (9th Cir. 2013) .............................................................. 27

*United States v. Igbonwa*,
120 F.3d 437 (3d Cir. 1997)................................................................. 39

*United States v. Jannotti*,
673 F.2d 578 (3d Cir. 1982)........................................................ 29, 30, 32

*United States v. Kennedy*,
576 F. App'x 76 (3d Cir. 2014) .................................................................. 46

*United States v. Lloyd*,
Crim. No. 12–865, 2014 WL 789078 (N.D. Ill. Feb. 27, 2014) .................. 20

*United States v. Lomax*,
293 F.3d 701 (4th Cir. 2002) .................................................................... 46

*United States v. Manzo*,
636 F.3d 56 (3d Cir. 2011) ....................................................................... 32

*United States v. Marcus*,
560 U.S. 258 (2010) ............................................................................. 17, 47

*United States v. Mares*,
402 F.3d 511 (5th Cir. 2005) .................................................................... 47

*United States v. Maury*,
695 F.3d 227 (3d Cir. 2012) ................................................................. 15, 16

*United States v. McGuire*,
178 F.3d 203 (3d Cir. 1999) ..................................................................... 31

*United States v. McKay*,
674 F. App'x 424 (5th Cir. 2017) ............................................................. 21

*United States v. McLean*,
No. 16-2993, 2017 WL 3309762 (3d Cir. Aug. 3, 2017) ................ 33, 34, 45

*United States v. McNeil*,
90 F.3d 298 (8th Cir. 1996) ..................................................................... 36

*United States v. Nolan-Cooper*,
155 F.3d 221 (3d Cir. 1998) ..................................................................... 25

*United States v. Olano*,
507 U.S. 725 (1993) ............................................................................. 18, 20

*United States v. Ozcelik*,
527 F.3d 88 (3d Cir. 2008) ................................................................... 40, 42

*United States v. O'Neil*,
595 F. App'x 665 (8th Cir. 2015) ............................................................. 38

*United States v. Price,*
    13 F.3d 711 (3d Cir. 1994) ................................................................38, 39

*United States v. Reynoso,*
    254 F.3d 467 (3d Cir. 2001)..................................................... 19

*United States v. Robinson,*
    844 F.3d 137 (3d Cir. 2016)........................................... passim

*United States v. Rodriguez,*
    360 F.3d 949 (9th Cir. 2004) .................................................. 32

*United States v. Roman,*
    91 F. App'x 767 (3d Cir. 2004) .............................................. 37

*United States v. Sanchez,*
    138 F.3d 1410 (11th Cir. 1998).............................................. 28

*United States v. Self,*
    681 F.3d 190 (3d Cir. 2012)................................................... 35

*United States v. Sharma,*
    190 F.3d 220 (3d Cir. 1999).................................................. 37

*United States v. Singletary,*
    268 F.3d 196 (3d Cir. 2001)................................................... 31

*United States v. Smith,*
    792 F.3d 760 (7th Cir. 2015) ................................................. 28

*United States v. Stimler,*
    864 F.3d 253 (3d Cir. 2017)................................................... 30

*United States v. Tann,*
    577 F.3d 533 (3d Cir. 2009).............................................19, 20

*United States v. Taylor,*
    480 F.3d 1025 (11th Cir. 2007).............................................. 32

*United States v. Tejeda,*
    476 F.3d 471 (7th Cir. 2007) ................................................. 21

*United States v. Titchell,*
    261 F.3d 348 (3d Cir. 2001)................................................... 21

*United States v. Townsend,*
  638 F. App'x 172 (3d Cir. 2015) ............................................................ 48

*United States v. Turner,*
  501 F.3d 59 (1st Cir. 2007) .................................................................... 45

*United States v. Twigg,*
  588 F.2d 373 (3d Cir. 1978) ................................................................... 30

*United States v. Tyson,*
  653 F.3d 192 (3d Cir. 2011) ............................................................... 17, 18

*United States v. Vitillo,*
  490 F.3d 314 (3d Cir. 2007) ................................................................... 39

*United States v. Warren,*
  361 F.3d 1055 (8th Cir. 2004) ................................................................ 36

*United States v. Washington,*
  869 F.3d 193 (3d Cir. 2017) .......................................................... *passim*

*United States v. Whitfield,*
  649 F. App'x 192 (3d Cir. 2016) ............................................................ 32

*United States v. Wright,*
  665 F.3d 560 (3d Cir. 2012) ................................................................... 47

*United States v. Zabielski,*
  711 F.3d 381 (3d Cir. 2013) ............................................................... 35, 38

*Williams v. Beard,*
  637 F.3d 195 (3d Cir. 2011) ................................................................... 23

## **Statutes**

18 U.S.C. § 1951 ............................................................................... 8, 31, 33

18 U.S.C. § 922 ........................................................................................ 8

18 U.S.C. § 924 ..................................................................... 8, 11, 40, 43

21 U.S.C. § 841 ........................................................................................ 8

21 U.S.C. § 846 ........................................................................................ 8

28 U.S.C. § 2111 .................................................................................... 37

## Rules

Fed. R. Crim. P. 30 ................................................................................ 42

Fed. R. Crim. P. 52 ................................................................................ 37

Fed. R. Crim. P. 52 ................................................................. 16, 37, 42

U.S.S.G. § 3B1.2 ............................................................... 1, 35, 38

U.S.S.G. § 4B1.1 ................................................................. 12, 36

# TABLE OF ABBREVIATIONS

"A"                refers to the Appendix filed by Defendant.

"DB"               refers to Defendant's Opening Brief.

"Dkt."             refers to the District Court's docket entries. (Pin cites are to
                   the page number appearing in the ECF legend *at the top* of
                   the electronically filed pleading.)

"PSR"              refers to the Presentence Investigation Report, filed under
                   seal with this Court.

## STATEMENT OF THE ISSUES

I.    Has Defendant failed to show that any plain error in applying *United States v. Armstrong*, 517 U.S. 456 (1996), to his motion for discovery to support a selective enforcement claim affected his substantial rights or would work a miscarriage of justice if left uncorrected on appeal?

II.    Did the District Court properly reject Defendant's claim that a stash house robbery reverse sting operation amounts to outrageous government conduct requiring dismissal of the indictment?

III.    Does Third Circuit precedent foreclose Defendant's claim that there was insufficient evidence that the conspiracy to commit Hobbs Act robbery, had it achieved its object, would have affected interstate commerce?

IV.    A.    Should this Court dismiss as moot Defendant's challenge to the District Court's refusal to award a two-level reduction for minor role under U.S.S.G. § 3B1.2(a), where the Career Offender Guideline determined Defendant's final offense level?

B.    If not, did the District Court clearly err when it found that the trial evidence showed that Defendant did not merit a minor-role reduction?

V.    A.    Did Defendant waive his claim that conspiracy to commit Hobbs Act robbery is not a "crime of violence" by jointly proposing an instruction that told the jury just the opposite?

B.    If not, did the District Court plainly err when it instructed the jury that conspiracy to commit Hobbs Act robbery is a "crime of violence," just as Third Circuit precedent now holds?

## STATEMENT OF RELATED CASES

Alexander Morales pled guilty to a two-count Information charging that he conspired with Defendant and Eladio Santana to forcibly steal—and then to possess with intent to distribute—cocaine. *United States v. Morales*, D.N.J. Crim. No. 14-290, Dkt. 19–21. He was sentenced to concurrent terms of 84 months' imprisonment and did not appeal. *Id.*, Dkt. 32–33. Santana pled guilty to identical conspiracy charges, *United States v. Santana*, D.N.J. Crim. No. 14-382, Dkt. 29–31, and his sentencing has been adjourned, *id.*, Dkt. 140.

## STATEMENT OF THE CASE

### I.   THE FACTS.

Defendant Leroy Brooks, a convicted felon, A886–87, conspired with Alexander Morales[1] and Eladio Santana to rob fifteen kilograms of cocaine from what they believed was a stash house operated by a Mexican drug cartel. On the day of the planned robbery, Brooks showed up with two guns, gloves, a mask, and a hat and asked pointed questions about the planned robbery.

### A.   Introduction.

In early May 2013, the ATF and DEA were investigating Alexander Morales for drug dealing and illegal firearms sales. A290. DEA Task Force Officer Steve Ingram served in an undercover capacity. A292–94, A626–27. Ingram purchased heroin from Morales several times. A292–94, A523–24, A631. Morales had a criminal history that included violent felonies, A295, A526–27, and he had brandished a firearm during his first meeting with

---

[1] Morales pled guilty and testified for the Government. A533–37.

2

Ingram, A633. A confidential source warned Ingram that Morales would rob him if he continued to sell heroin to Morales, A295–96, who admitted at trial that he was robbing drug dealers at gunpoint in May 2013, A525. Ingram thus proposed robbing cocaine from a stash house. Morales appeared interested and expressed no hesitation about using violence. A297–98, A526–29, A631–33.

### B.    The Reverse Sting.

The reverse sting contemplated Ingram's introducing Morales to Stacy Brown, an undercover ATF agent. A295, A636, A733. Brown played the role of a courier for a Mexican drug cartel who needed a crew to help him rob a stash house where his employers stored cocaine. A296, A637, A734. In his role as courier, Brown would come to New Jersey to pick up five kilograms of cocaine from a stash house guarded by two men armed with firearms. A297. Brown claimed he wanted to rob his employers because they had not paid him for transporting a previous shipment. A323, A529, A1044. The agents never instructed Morales to rope in others, and they never told anyone what tools to bring to carry out the robbery. A327, A355, A434–35, A455, A457, A668–69.

### 1.    The June 4th Meeting.

On June 4, 2013, Morales, Ingram, and Brown met at a Burger King in Pennsauken, New Jersey.[2] They met so Ingram could introduce Brown to Morales. A298–99, A636–37, A735. Brown told Morales that for the past two

---

[2] That meeting and all subsequent such meetings—including the arrest—were video- and audio-recorded. *See* A1030–1122 (transcripts). The Government will supply those recordings upon request.

years he had been coming to New Jersey to pick up three to five bricks of cocaine, which were stored in a cooler that contained fifteen bricks.[3]  Two Mexican men armed with firearms guarded the stash house that contained the cooler. A1031–32. Brown said, "I'm looking for somebody to help me rob these mother-f*ckers." A1032. Morales was eager to participate, A530, A637–39, A735, boasting that "I got a team trained to go man," A1033; *see* A313.

Morales and Brown did not reach a definitive agreement on how to split up the cocaine because Morales wanted to discuss it with his team. A1034. Morales said "I'm gonna holler at my man," A1037, referring to his cousin Santana, with whom he had committed robberies before, A520, A531–33, A585. Santana, too, was interested in the proposed robbery. A538–39.

## 2.    The June 10th Meeting

On June 10th, Morales and Santana met with Ingram and Brown at the same Burger King in Pennsauken. A314, A319–20, A322, A538–39, A735, A1041. Although Morales had described the plot to Santana, Brown repeated what he had said at the June 4 meeting, adding more details about the stash house. A1041–43. Santana asked about the size of the men guarding the house and the type of weapons they carried. A1041–42, A1046–48. He expressed no hesitation in using the violence required to commit the robbery. A329, A641–42, A1046, A1054–55. Ingram then showed Morales and Santana a "trap"

---

[3]  "Brick" is a slang term for kilogram. A323, A541, A692. Fifteen kilograms was consistent with what one would have expected to find in a stash house in Camden, New Jersey, A311–12, A323, and such a quantity was for distribution, not personal consumption, A538, A695.

built into his car, which could be used to conceal weapons and drugs. A327–29, A539–40, A546, A1063–64.

Morales initially understood that they would split the fifteen kilograms with five going to Brown and ten to Morales and Santana. A324, A545–46, A639–40, A1058–61. But Morales admitted at trial that they had been planning to steal Brown's take as well. A546. By this point, Morales and Santana were serious about committing the robbery. A542–43.

### 3.    The June 14th Meeting

On June 14th, Santana picked up Morales on the way to meet Ingram at a Red Lobster at the Cherry Hill Mall. This time, Brooks was in the car. A546–47, A644. Morales explained the proposed robbery to Brooks. A547. Morales believed that Brooks could handle such a robbery because of his size and aggressive nature. A547, A605. Brooks was amenable to committing the proposed robbery and expressed no hesitation about it. A547–48.

At the Red Lobster, Morales sold heroin to Ingram in Ingram's car. A341–45, A548–49, A645–46, A737–38, A1067–68. Morales then introduced Brown to Brooks. A553. Brown advised that he had gotten the call regarding the next delivery of cocaine, and asked if they wanted to discuss the robbery. A737–38, A1081. They were unable to do so, but later that day, Ingram called Morales to discuss the robbery with Morales and his crew. A349–50, A1074–75. Morales responded, "Yeah, I mean I wanted to hear that too, 'cause I'm bringing my other man in" (referring to Brooks), and added "[Brown] met him. I introduce him." A1075; *see* A350–51, A450, A555, A647–49. Morales

5

continued, "Three is better than two, you feel me?" A1075; *see* A351–52, A554–55; *see also* A1087 ("I just need to get . . . my other man").

On June 17th, Ingram told Morales by phone the robbery would occur the following day. A649–50. Morales said he would alert Santana and Brooks. A556–47, A619–20, A650, A1086–87.

### 4.     The June 18th Takedown.

On June 18th, the ATF planned to have Ingram meet Morales, Santana, and Brooks at the Cherry Hill Mall and drive together to a storage facility in Maple Shade, where Brown (and a SWAT team) was waiting. That plan changed because Morales was afraid to drive with guns in his car. A355–61, A366–71, A651–53, A738–39, A1089–91, A1095–98.

Ingram drove to Camden using the car with the trap in it. A559–61, A656–57. Brooks, who was already wearing black batting gloves, got in and put a bag into the already-open trap. A658–59, A567–68, A574. Morales testified that Brooks brought two semi-automatic handguns, whereas Santana brought a revolver. A561–62. All three firearms were in the bag Brooks placed in the trap. A562–63. Brooks also carried a working taser. A400–03, A564–65.

Ingram closed the trap and drove Morales, Santana, and Brooks, to the storage facility in Maple Shade. A371–77, A432, A453, A616, A660–62, A1098–1104. On the way, Brooks asked pointed questions about the men guarding the stash house:

- "Um, what type of -- So you, you, you seen these, you, you, you know these dudes evidently."

6

- "like, they heavy, small, slim? Aggressive."

- "But the thing is, what you do know is, they old heads, that they aggressive, that for real, aggressive demeanor?"

- "They ever had they, they ever had their hammers out, demand money, come in the crib, and do business?"

A1106, A1108–09; *see* A571–72, A663–64.

Ingram discussed how they would split the fifteen kilograms: five to Brown and ten to Morales, Santana, and Brooks; Brooks nodded his head in agreement. A666–67. Unbeknownst to Ingram, however, Morales, Santana, and Brooks had already decided to keep the entire fifteen kilograms for themselves with the understanding that each would walk away with five. A564, A569–71, A588.

When Ingram, Morales, Santana, and Brooks arrived at the storage facility, Brown was waiting for them. A386, A393–94, A669, A739. While Brown was answering Santana's questions, Brooks put his hand up, interrupted Santana, and asked a series of additional questions about the stash house and the two men guarding it:

- "Carlos in the kitchen. Do he got a firearm on him?"

- "Their physical makeup, chubby guys, slim? Lean?"

- "This, this ain't nothing new right here. We just wanted to make sure the type of characteristics them two dudes is dealing with."

- "You saying they got. They don't have no firearms in their hands"

- "Ours [firearms] will be raised."

A1119–20; *see* A396–97, A670, A739–42.

Eventually, Ingram and Brown gave the signal for the arrest. The SWAT team converged on Morales, Santana, and Brooks. A400–04. An ATF evidence-collection team processed the undercover vehicle with the trap. A487–89. From it agents recovered the canvass bag Brooks had placed there. A373–74. Inside the bag were: a black mask; a black wool hat; a .38 caliber revolver loaded with five rounds of ammunition; and a gun box containing a black ski mask and two firearms—a .45 caliber semi-automatic and a .9 millimeter semi-automatic, both of them loaded. A491–500.[4]

## II. PROCEDURAL HISTORY.

### A. The Indictment.

A federal grand jury sitting in Camden, New Jersey, returned a four-count Superseding Indictment. A25. Count 1 charged that Brooks conspired with Morales and Santana to interfere with interstate commerce through robbery and threats of violence, in violation of 18 U.S.C. § 1951(a). A25. Count 2 charged that Brooks conspired with Morales and Santana to distribute five kilograms or more of cocaine, contrary to 21 U.S.C. § 841(a), (b)(1)(A), in violation of 21 U.S.C. § 846. A26. Count 3 charged that Brooks knowingly possessed three firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). A27. Count 4 charged that Brooks carried three firearms during and in relation to two predicate offenses (the conspiracies charged in Counts One and Two), in violation of 18 U.S.C. § 924(c)(1)(A)(i). A28. Brooks

---

[4] All three weapons were test fired and found to be operable, A500–01, and none was manufactured in New Jersey, A883–85.

appeared before the Honorable Renée M. Bumb, U.S.D.J., and pleaded not guilty. Dkt. 59.

### B.    The Pretrial Motions.

Brooks filed several pretrial motions. *First*, he moved to dismiss the charges, claiming that they were the product of a sting operation by federal agents that amounted to "outrageous government conduct." Dkt. 32; A34–39. The District Court denied that motion, Dkt. 42, finding that stash-house stings are permissible generally, and that there was no interaction between any Government agent and Brooks specifically; rather, Morales, the target of the sting, had invited Brooks into the dual conspiracies, A160–62. The District Court adhered to that ruling when new counsel orally re-raised the motion at a later hearing. Dkt. 62; A206–07.

*Second*, invoking *United States v. Armstrong*, 517 U.S. 456 (1996), Brooks twice sought discovery that would enable him "to show that the ATF policy of fake stash house stings utilizes the deliberate practice of identifying defendants by their racial identity." Dkt. 35; A40; *see* Dkt. 56, 58; A74, A90. The first time, the District Court denied the motion because Brooks had not shown that any non-minority participants in the conspiracies were not charged (hence, no discriminatory effect), and that Brooks was not brought into the conspiracy by any Government agent as a result of any governmental action (hence, no discriminatory purpose). Dkt. 42; A162. The second time, the District Court analyzed the data put forward by Brooks's new counsel—23 white males with prior robbery convictions in Burlington County, New Jersey, whom Brooks

claimed the Government could have targeted but did not—and concluded that Brooks had failed to show that they were similarly situated to him (or to Morales and Santana). Dkt. 82; A216–19.

Third, Brooks claimed that the District Court lacked subject matter jurisdiction over the Hobbs Act offense. Dkt. 51. He claimed there would have been no effect on interstate commerce without the Government's sting operation, and that the Government had somehow manufactured federal jurisdiction. A56–66. The District Court denied that motion, Dkt. 82, relying on settled precedent holding that "had the crime succeeded, [] interstate commerce would have been impacted," A266.

## C.    The Trial.

On January 11, 2016, a jury trial commenced. The Government called: ATF Special Agent Sheridan (the lead case agent); ATF Special Agent Jenna Polack (who recovered the canvass bag from the trap); Alison Rees, a fingerprint specialist with the ATF; Ingram; Morales; DEA Special Agent David McNamara (who testified as an expert witness on drug conspiracies and cocaine importation and distribution); and Brown.

At the close of the Government's case, Brooks made an oral motion for a judgment of acquittal, A760, which the District Court denied, A762. Brooks thereafter called no witnesses and did not testify in his own defense. A762–66.

During the charge conference, the District Court went through the Joint Requests to Charge one by one. *See* A707. Request No. 49 addressed the § 924(c) count and provided that "[t]he offense alleged in Count 1 of the

10

Superseding Indictment is a crime of violence." Dkt. 89 at 80. When the Court considered Request 49, Brooks did not object on the ground that Hobbs Act robbery was not a crime of violence. A714. Nor did Brooks raise that objection when the District Court revisited the instructions on the § 924(c) count the following morning. A726–27. The District Judge thereafter instructed the jury that, with respect to the § 924(c) count, "[t]he offense alleged in Count 1 of the Superseding Indictment is a crime of violence." A806. Following the jury charge, there were no "exceptions to the charge as read." A816.

### D.    The Verdict.

On January 19, 2016, the jury convicted Brooks on Counts 1, 2 and 4. Dkt. 107; A105, A874–86. The jury then heard additional evidence and received further instructions on Count 3, which had been severed by mutual agreement of the parties, Dkt. 85, 91, 93, and found Brooks guilty on that Count as well, *see* A877–902; *see also* Dkt. 109; A108.[5]

### E.    The Post-Trial Motion.

Brooks's post-trial motion raised two claims pertinent to this appeal: (1) the jury should not have been instructed that conspiracy to commit Hobbs Act robbery is a crime of violence for purposes of 18 U.S.C. § 924(c); and (2) the District Court's instructions on the Hobbs Act offense should have required the jury to find that there would have been an effect on interstate commerce in the absence of "federal intervention." Dkt. 121; A117–37.

---

[5]    Although Count 4 was renumbered as Count 3 for the initial phase of the trial, *see* A107, this Brief refers to the counts as they were originally pled.

Prior to sentencing, the District Court denied both motions. The Court denied the first motion because it was foreclosed by *United States v. Robinson*, 844 F.3d 137 (3d Cir. 2016). *See* A920–22. The Court denied the second motion because a conspiracy to steal narcotics for distribution "does, in fact, establish a sufficient interstate nexus to satisfy the jurisdictional requirements of the Hobbs Act, even where the intended victim or victims and drugs are entirely fictional." A925.

### F.    The Sentence.

In advance of sentencing, the Probation Office prepared a PSR that calculated Brooks's total adjusted offense level as 32. *See* PSR ¶ 61. But because Brooks qualified as a career offender, *see* PSR ¶¶ 62 & n.2, 80, his final offense level automatically became 37, *see* PSR ¶ 62 (citing U.S.S.G. § 4B1.1(b) (chart)), and his Criminal History Category became VI, PSR ¶ 80. Brooks thus faced an advisory Guidelines range of 360 months to life on Counts 1–3, plus a mandatory consecutive sentence of 60 months on Count 4. PSR ¶¶ 130–31.

At sentencing, Brooks sought a two-level minor role reduction, arguing that he was less culpable than his coconspirators, while recognizing that the career offender designation could render the issue moot. A956–58. The District Court denied that reduction, finding that Brooks "clearly understood the scope of the criminal activity," was "in position of authority, based on the conversations that were recorded," and even "brought two of the three guns." A961–62. The Court then rejected Brooks's challenge to the career offender designation, A964–68, a ruling Brooks does not appeal.

12

The District Court thus found that Brooks had a final offense level of 37, and a Criminal History Category of VI, for an effective advisory Guidelines range of 420 months to life. A1002. After hearing from the Government and Brooks, A1004–17, the District Court considered the § 3553(a) factors and awarded Brooks a five-level downward variance, A1017–25. The Court ultimately imposed sentence as follows: concurrent terms of 210 months' imprisonment on Counts 1 through 3, plus a consecutive 60-month sentence on Count 4. The Court also imposed three-year terms of supervised release on Counts 1 and 3 and five-year terms on Counts 2 and 4, all concurrently. A1026; *see* Dkt. 127.

The District Court entered final judgment on March 28, 2017, Dkt. 128; A1, and Brooks filed his notice of appeal the following day, Dkt. 129; A6.

## SUMMARY OF ARGUMENT

I.    In light of *United States v. Washington*, the District Court erred when it applied *Armstrong* to Brooks's discovery motion. But Brooks has failed to prove that this error affected his substantial rights or that failing to correct that error would work a miscarriage of justice.

II.    The District Court properly denied Brooks's claim of outrageous government conduct. The sting used here compared favorably to those used in other cases where no due process violation was found.

III.    The District Court properly denied Brooks's motion for judgment of acquittal on Count 1. Ample evidence showed that the conspiracy, had it achieved its object of stealing kilogram quantities of cocaine for distribution, would have had more than a minimal effect on interstate or foreign commerce.

IV.    Brooks's challenge to the District Court's refusal to award him a minor-role reduction is moot because his final offense level was determined by the Career Offender Guideline. At any rate, the District Court did not clearly err when it relied on trial evidence to deny the reduction.

V.    Brooks waived his challenge to the jury instruction informing the jury that Hobbs Act robbery is a crime of violence by jointly proposing that very instruction. At any rate, that instruction correctly stated the law, as a precedential decision of this Court subsequently held. And Brooks could not possibly show prejudice since the jury was presented with a valid, alternative § 924(c) predicate (the drug-distribution conspiracy in Count 2), on which Brooks was convicted.

# ARGUMENT

I. **Although The District Court Erred In Applying** *United States v. Armstrong*, **517 U.S. 456 (1996), To Brooks's Motion For Discovery Supporting A Selective Enforcement Claim, Brooks Has Failed To Show That This Error Affected His Substantial Rights Or Would Work A Miscarriage Of Justice If Not Corrected On Appeal.**

**Standard of Review: Plain error.** *United States v. Maury*, **695 F.3d 227, 251–52 (3d Cir. 2012).**

Brooks claims the District Court erred when it applied *United States v. Armstrong*, 517 U.S. 456 (1996), to deny his motion for broad-ranging discovery supporting a selective enforcement claim. DB20–24. But Brooks's motions invoked the *Armstrong* standard and never argued for a different one. Brooks thus forfeited his current objection and must show plain error. To be sure, *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017), has changed the legal standard for claims like Brooks's. So Brooks can now show "error" that is "plain." But he cannot show that any such error affected his substantial rights or would work a miscarriage of justice if left uncorrected. This Court, therefore, should affirm the orders denying discovery.[6]

---

[6] Brooks repeatedly complains that the ATF avoided targeting "whites" with the same stash house scenario that ensnared Brooks. DB22–24. Yet Morales—the actual target of the sting in this case—identifies himself as white. So if Brooks's *real* claim is that the ATF unconstitutionally targets only non-whites, the record in this case belies it, as Morales, who testified at trial, pleaded guilty to the same conspiracy charges of which the jury convicted Brooks. A533–37. The Government will generously read Brooks's brief to claim that the ATF improperly targeted African-Americans and Hispanics instead of "non-Hispanic white[s]," *Washington*, 869 F.3d at 219 n.113, even though Brooks's motion below also focused on race, Dkt. 35; A40.

### A.      Brooks Must Show Plain Error.

Brooks filed two motions seeking broad-ranging discovery supporting what he himself labeled as a "selective prosecution" or "racial profiling" claim. In each one, he invoked *United States v. Armstrong*, 517 U.S. 456 (1996), and claimed that he had satisfied *Armstrong*'s requirements. *See* A40–42 (first motion); *see also* A78 (renewed motion) (new counsel complains that "prior counsel did not properly address the issue" because he "did not produce as required by [*Armstrong*] evidence of disparate treatment"). He never argued that a different legal standard should apply; nor did he bring to the District Court's attention the Seventh Circuit's decision in *United States v. Davis,* 793 F.3d 712 (7th Cir. 2015), which issued *before* oral argument on his renewed discovery motion. The District Court thus applied the rigorous *Armstrong* standard and held that Brooks had failed to satisfy it. A162, A216–19.

On appeal, Brooks has shifted the focus of his claim. He now argues that "[i]t is not clear that [*Armstrong*'s] longstanding deference to 'prosecutorial prerogative' ought necessarily to apply to operational decisions of law enforcement agents; police officials simply are not prosecutors. In that sense, the trial court erred in requiring a threshold showing of discriminatory effect pursuant to Armstrong." DB21. In so arguing, Brooks does not cite *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017), which accepted that claim. Because Brooks argued below that *Armstrong* applies, he forfeited his claim that the trial court should have used a more lenient standard. He thus must show plain error. *See* Fed. R. Crim. P. 52(b); *see also United States v. Maury*, 695 F.3d

227, 251–52 (3d Cir. 2012) ("because the Defendants never squarely presented the Court with this challenge, we hold that plain error review applies to the Defendants' claim").[7]

Brooks bears the burden of proving that: "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). Even if those requirements are satisfied, this Court may deny a remedy. *See United States v. Tyson*, 653 F.3d 192, 211 (3d Cir. 2011). In light of *Washington*, Brooks can show error that is plain. But Brooks has failed to prove prejudice, let alone that denying him a remedy would work a miscarriage of justice.

---

[7] In *Washington*, the Government questioned whether the claim was adequately preserved because the defendant initially had referred to his claim as one alleging selective prosecution, only to claim on appeal that he was alleging selective enforcement. This Court was "satisfied . . . that Washington adequately developed the claim across his District Court submissions." 869 F.3d at 213 n.81. Indeed, one of those submissions cited the decision of the District Court for the Northern District of Illinois in *Davis*, which granted broad discovery to a stash-house sting target who claimed that he was a victim of selective enforcement. *United States v. Washington*, E.D. Pa. Crim. No. 13–171, Dkt. 134 at 6. Here, by contrast, the most Brooks did was complain about the unfairness of the *Armstrong* standard that he conceded applied, *e.g.*, A157, A210, A212, never mentioning *Davis*.

### B.    Brooks Can Show A Plain Error.

The first question is whether there was error, *i.e.*, a "[d]eviation from a legal rule." *United States v. Olano*, 507 U.S. 725, 732–33 (1993)). There was.

Just before Brooks filed his opening brief, this Court considered an appeal from an order denying a motion for discovery from a defendant who, like Brooks, was ensnared in an ATF-led stash house sting. This Court rejected the Government's argument that *Armstrong* controlled, *Washington*, 869 F.3d at 219–20, and held that "district judges have more flexibility . . . to permit and manage discovery on claims like Washington's," *id.* at 213.

In relaxing the *Armstrong* standard, this Court agreed with the Seventh Circuit that "[t]he special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *Armstrong* and *Bass*—and our own reasoning in our pre-*Armstrong/Bass* case law on the same subject—does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity." *Washington*, 869 F.3d at 217 (citing *Davis,* 793 F.3d at 712). This Court held that:

> a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect. The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) even if the underlying challenge is to law enforcement decisions. . . . . [T]he proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

*Id.* at 221. *But see United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).

18

The Government respectfully submits that *Washington* erred in this respect and notes that the Department of Justice is presently considering whether to seek further review in that case or another raising the same issue. But because *Washington* binds subsequent panels, *see* 3d Cir. I.O.P. 9.1 (2017), Brooks (at least for now) has borne his burden of showing error that is "'plain' at the time of appellate consideration," *Henderson v. United States*, 568 U.S. 266, 279 (2013) (quotation marks and citation omitted).[8]

### C. Brooks Has Failed To Show That Any Error Affected His Substantial Rights Or That Denying Him A Remedy Will Work A Miscarriage Of Justice.

Under Rule 52(b), Brooks bears the burden of proving that the error affected his substantial rights. "[T]o have affected a defendant's substantial rights, a plain error must have caused the defendant prejudice, in that it 'affected the outcome of the district court proceedings.'" *United States v. Tann*, 577 F.3d 533, 538 (3d Cir. 2009) (citation omitted). This Court thus undertakes "what is essentially a harmless error analysis, except that [Brooks] bears the burden of showing that he was prejudiced by the error rather than the Government having the obligation to show that he was not." *United States v. Reynoso*, 254 F.3d 467, 474–75 (3d Cir. 2001).

---

[8] We ask this Court to acknowledge that the Government has preserved its claim that there was no error here because *Armstrong* applies to discovery motions like Brooks's. *E.g., United States v. Benjamin*, 711 F.3d 371, 381 (3d Cir. 2013) (acknowledging that claim was foreclosed by precedent and was raised solely to preserve it for further review).

19

Significantly, *Brooks* "has the burden to make 'a specific showing of prejudice.'" *Tann*, 577 F.3d at 538 (quoting *Olano*, 507 U.S. at 735). What this specific showing of prejudice must entail is dictated by the error in question. In *Washington*, this Court stressed "that the end 'goal' of" "a discovery motion" such as Brooks's "is a valid claim of selective enforcement under the heightened substantive standards" imposed by *Armstrong*. *See* 869 F.3d at 221. Thus, *Washington* suggests that a defendant who bears the Rule 52(b) burden of showing prejudice must prove not just that the District Court would have afforded at least some discovery had it been aware of the discretion *Washington* now affords it, but also that the discovery so afforded would have led to a successful—or at least viable—motion under *Armstrong*'s substantive standards. *Cf. United States v. Lloyd*, Crim. No. 12–865, 2014 WL 789078, at *3 (N.D. Ill. Feb. 27, 2014) ("The issue is whether a selective-prosecution defense likely would have succeeded, and there is no indication that it would have, even assuming that the discovery motion would have been granted.").[9]

Brooks has failed to make that "specific showing of prejudice" here. *Tann*, 577 F.3d at 538. In fact, he has not even tried. Instead, he simply assumes he preserved his claim and argues that the District Court "erred in not

---

[9] *Washington* involved a preserved claim, which meant *the Government* bore the burden under Rule 52(a) of proving no discovery would have been allowed even had the trial court been aware of the discretion *Washington* now affords it. Because the Government could not meet that burden, this Court decided to "vacate the District Court's discovery orders and remand for a renewed decision under the framework we articulate today." 869 F.3d at 222.

granting the plenary discovery [he] sought," DB24, neglecting to describe the vastly overbroad nature of those requests, *see* A84–87 (listing eight extremely broad document demands). That is insufficient to satisfy Rule 52(b). *See United States v. Titchell*, 261 F.3d 348, 351 (3d Cir. 2001) ("Indeed, Titchell does not even attempt to meet his burden of demonstrating prejudice from the error, and thus the error cannot be grounds for relief."). *Accord United States v. McKay*, 674 F. App'x 424, 426 (5th Cir. 2017) (unreported) ("McKay makes no effort to show that the error violated his substantial rights . . . . Thus, he has not shown reversible plain error.") (citation omitted).

Even if Brooks can show prejudice (and he cannot), he also must prove that not affording him a remedy would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631–32 (2002) (quotation marks and citation omitted). He cannot. In fact, awarding Brooks a remedy would lead to a pointless do-over. *See United States v. Tejeda*, 476 F.3d 471, 475 (7th Cir. 2007) ("a remand . . . could well impugn the reputation of the courts among the public," which "is, we think, somewhat fatigued by expensive, technical, but essentially meaningless do-overs").

First, the District Court's rulings strongly suggest that Brooks's discovery motions would meet the same fate even under *Washington*. His first motion asserted that five then-pending prosecutions arising from ATF reverse stings involved defendants who were Black or Hispanic, which Brooks claimed evinced discriminatory purpose. A40–41. His second motion listed 23 Caucasian males convicted of robbery in Burlington County whom Brooks

21

claimed the ATF could have targeted but did not, which Brooks claimed

showed discriminatory effect. A80–82, A82; *see* DB22–23. The District Court

was underwhelmed. It found that Brooks's showing on discriminatory effect

utterly flunked the basic requirements of settled equal-protection precedents.

A217–19; *see Bass*, 536 U.S. at 864 ("raw statistics regarding overall charges say

nothing about charges brought against *similarly situated defendants*"); *see also*

*United States v. Hedaithy*, 392 F.3d 580, 606 (3d Cir. 2004) ("Demonstrating

that thousands of other people have also cheated on the TOEFL exam does

nothing to identify persons who are similarly situated.").[10]

Discovery seems particularly inappropriate here, because the record

shows that the ATF did not target Morales. A confidential informant

introduced Morales to Ingram as a source of heroin. A292, A631. And after

Ingram began purchasing heroin from Morales, a confidential informant

reported that he was robbing drug dealers and intended to rob Ingram. A295–

96. *That*—and not ethnicity—is why the ATF floated the stash-house sting idea

to Morales*, and it is fatal to any selective enforcement claim. *See United States*

*v. Avery*, 137 F.3d 343, 354 n.5 (6th Cir. 1997) ("Where the decision to

investigate someone" is "based on a tip from a source outside the police

---

[10] Indeed, Brooks repeatedly compares his criminal record and alleged proclivities to the potential Caucasian targets he identified. DB22–23. But that is the wrong comparison because Brooks was not targeted at all. Instead, the potential Caucasian targets Brooks identified should be compared *to Morales* (who also was not targeted for the reasons set forth in text).

organization …., the officers obviously cannot control the race of the person they investigate and ultimately contact. Hence, their selection of that person as a target of investigation does not amount to an equal protection violation.").[11]

Second, as set forth above, "the end 'goal' of" "a discovery motion" such as Brooks's "is a valid claim of selective enforcement under the heightened substantive standards" imposed by *Armstrong*. *Washington*, 869 F.3d at 221. Such motions are routinely denied when properly preserved and brought prior to trial. Thus, a defendant like Brooks, who invokes plain error review in an effort to overturn an otherwise valid judgment, bears an even heavier burden to show that he is not engaged in a mere fishing expedition, but instead that he seeks discovery that, if granted, would lead to a successful selective enforcement motion. *Cf. Williams v. Beard*, 637 F.3d 195, 210–11 (3d Cir. 2011) ("Ultimately, Williams' request amounts to an entreaty to engage in a fishing expedition. The law is clear, however, that such speculative discovery requests should be rejected."); *Charles v. Artuz*, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998) (denying defendant's motion for discovery where "his stated purpose is merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his

---

[11] Nor was Brooks targeted by the ATF. Although this Court held that a person invited into a sting by the actual target has derivative standing to raise a selective enforcement claim, *Washington*, 869 F.3d at 222 (citing *Davis*, 793 F.3d at 722–23), the Government preserves its objection to that holding, which seems to conflict with principles of standing for equal-protection claims.

claims of error. In sum, his motion amounts to a 'fishing expedition' which he hopes will yield a document providing ground for a writ.").

### D.     Conclusion

In sum, Brooks failed to preserve his claim, and he has failed to show that any plain error affected his substantial rights or would work a miscarriage of justice if left uncorrected. If this Court disagrees with the Government and orders a remand, it should—as it did in *Washington*—"emphasize that we are not directing the District Court to grant discovery; our collective thumbs are not on the scale." 869 F.3d at 222.

**II.   The District Court Correctly Rejected Brooks's Claim Of Outrageous Government Conduct.**

> <u>Standard of Review</u>: **Plenary for "the district court's legal conclusions" and "clear error" for "the court's factual findings."** *United States v. Nolan-Cooper*, **155 F.3d 221, 229 (3d Cir. 1998).**

Brooks next contends that the District Court should have dismissed the Indictment because his prosecution amounted to outrageous government misconduct. DB24–33. But "no court of appeals has found that the Government has" engaged in outrageous conduct "in setting up a stash house reverse sting." *United States v. Dennis*, 826 F.3d 683, 698 (3d Cir. 2016) (Ambro, J., concurring in part and dissenting in part on other grounds). This case presents no reason to change course.

In *Dennis*, the ATF targeted a defendant using a confidential informant who had been dealing drugs with the defendant for years and whom the defendant considered a friend. *Id.* at 686–87, 691 n.6, 692. After recruiting the defendant with a story about needing money to tend to his cancer-stricken mother, the confidential informant drove the defendant to every meeting with the undercover agent and actively participated in those meetings. *Id.* at 687–89, 691. According to the defendant, the informant also provided one of the guns for the home invasion and urged the defendant to "'play the role' of a seasoned robber." *Id.* at 691 & n.7. And the morning the "robbery" was supposed to take place, the informant drove the defendant and his robbery crew to a storage facility that was supposed to be the staging ground for the robbery. *Id.* at 689.

25

This Court nonetheless rejected the defendant's claim "that the indictment should be dismissed on the basis of an outrageous prosecution that violated his right to due process." *Id.* at 694. It did not matter:

> that the Government created the crimes; that it had no credible basis for asserting that he was supporting himself and his family with criminal activity, nor any basis for suspecting Dennis would participate in the crimes; that the Government actively encouraged Dennis to participate in the crimes; and finally, that it provided the necessary information and implements for the crime.

*Id.* at 695 (citing *United States v. Beverly*, 723 F.2d 11, 12–13 (3d Cir. 1983) (per curiam)).[12]

The events leading to Brooks's arrest and prosecution are a far cry from those in *Dennis.* Most importantly, the Government did not target Brooks; rather, Brooks was invited into the robbery plan by Morales (someone whom the ATF had ample reason to target). A547–48, A605. The District Court rightly found that significant. A160–62, A206–07; *see United States v. Graham*, Crim. No. 12-418, 2014 WL 4105978, at *2 (E.D. Pa. Aug. 21, 2014) ("Although the Government thus had no information about Graham's criminal history or reason to suspect he had any prior involvement in home invasion robberies, it was Whitfield, not the Government, who brought

---

[12]  Although Judge Ambro expressed "some concerns about the practice of stash house reverse stings[,]" he joined "the majority's due process analysis[,]" in part because the Government did not "select a defendant at random" but instead proceeded with the sting only after corroborating information from the confidential informant about the defendant's criminal past. *Dennis*, 826 F.3d at 696, 699. Here, as set forth in text, the Government did not select Brooks at all; rather, Morales did.

Graham into the conspiracy."), *aff'd on other grounds*, 639 F. App'x 152 (3d Cir.), *cert. denied*, 137 S. Ct. 322 (2016).

Beyond that, without any Government encouragement whatsoever, Brooks asked the two undercovers specific, relevant questions about the robbery he expected would occur on June 18th. A1106, 1108–09, A1119–20; *see Graham*, 2014 WL 4105978, at *3 (noting that Graham "participated in the discussion of the robbery plan, adding that the robbers should first go after the younger armed guard upon entering the stash house."). And Brooks brought two loaded semi-automatic weapons and a taser with him, A373–74, A400–03, A491–500, A561–69, A574, even though the agents never suggested to Moarales, Santana, and Brooks what ttools they should bring to consummate the robbery, A327, A355, A434–35, A455, A457, A668–69. Given the outcome in *Dennis*, there was no outrageous government conduct here. *See Graham*, 2014 WL 4105978, at *3 (noting that "Graham brought a gun to the meet-up 'in case somebody need it'").

Brooks can distinguish *Dennis* only by ignoring it. DB23–37. In fact, the sting here compared even more favorably to other stash house stings that have withstood claims of outrageous government conduct. In *United States v. Hullaby*, the Government employed a confidential informant who was on probation for his role in a "series of home invasions" where the perpetrators "dressed in law enforcement uniforms when raiding homes," used a "battering ram to break down locked front doors," and carried "AK-47s, shotguns, and other weapons," 736 F.3d 1260, 1262 (9th Cir. 2013). In *United States v. Black*,

the Government sent its confidential informant trolling for potential targets in bars in "bad" parts of town, for which he "was paid $100 per day." 733 F.3d 294, 298–99 (9th Cir. 2013), *reh'g en banc denied*, 750 F.3d 1053 (2014). The "government created the proposed crime, initiated contact with the defendants through the CI's approach" to a third party at one of those bars, "and set the bait—all without any previous individualized suspicion—or even knowledge—about the defendants' criminal history or activities." *Id.* at 307. In both cases, the Ninth Circuit rejected outrageous government conduct claims.

Further, to date, no Circuit has voided a stash-house-sting conviction on outrageous-government-conduct grounds. *See United States v. Colon*, 71 F. Supp. 3d 269, 281–82 (D. Conn. 2014) (citing cases). Beyond this Circuit in *Dennis* and the Ninth in *Hullaby* and *Black*, the Fourth, Seventh, Eighth and Eleventh Circuits all have rejected outrageous-government-conduct claims in affirming convictions obtained through stash house stings. *United States v. Combs*, 827 F.3d 790, 792–96 (8th Cir. 2016); *United States v. Hare*, 820 F.3d 93, 102–04 (4th Cir. 2016); *United States v. Smith*, 792 F.3d 760, 764–68 (7th Cir. 2015); *United States v. Sanchez*, 138 F.3d 1410, 1413–14 (11th Cir. 1998).

Against this mountain of authority, Brooks asks this Court to adopt the six-factor test the Ninth Circuit promulgated in *Black*. DB31 (citation omitted). But as set forth above, the Ninth Circuit in *Black rejected* a claim of outrageous Government conduct based on facts far more troubling than those present here. Indeed, Judge Ambro noted that "*Black* is a cautionary tale about what can result if the power to create crimes is employed without constraints. Our

28

facts are not nearly as severe." *Dennis*, 826 F.3d at 699 (Ambro, J., concurring in part and dissenting in part on other grounds).

Brooks makes much of the fact that law enforcement had no way of knowing whether he had a criminal record or was otherwise predisposed to engaging in violent robberies because it was Morales who roped him into the scheme. DB31–32. But there is no Due Process requirement that law enforcement predicate a sting's target. Where "'the conduct of the investigation itself does not offend due process, the mere fact that the investigation may have been commenced without probable cause does not bar the conviction of those who rise to its bait.'" *United States v. Driscoll*, 852 F.2d 84, 87 (3d Cir. 1988) (quoting *United States v. Jannotti*, 673 F.2d 578, 609 (3d Cir. 1982) (*en banc*)). Here, the Government knew Morales (the original target of the sting) had a criminal record that included violence, and that he was reportedly robbing drug dealers *before* proposing the stash-house robbery. A294–95. There was nothing outrageous about that proposal.

Moreover, it is hardly "outrageous" that the robbery proposal motivated Morales to enlist others like Brooks and Santana, both of whom willingly signed up. In fact, Brooks brought two guns and a taser, asked numerous operational questions, and further agreed with Morales and Santana to rob Brown of his share of the loot. Although courts have criticized these stash house stings, the fact remains that stash houses exist, and so do robberies of them. A695–97. Both offenses can "easily elude detection," because the participants in them "have an interest in concealment." *Jannotti*, 673 F.2d at

609 (discussing public corruption). A stash-house robbery is a "crime [which] goes unreported," A696, but which poses grave risks of violence and collateral damage, *see Black*, 733 F.3d at 309; A697.

Here, the coconspirators themselves decided to bring guns and a taser to the robbery and expressed no qualms about using force to accomplish their shared goals. But for the fact that this was a sting operation, the actions they intended to take could have caused death or serious injury not just to those guarding the stash house, but to innocent bystanders. Determining "what undercover operations are necessary to" identify and incapacitate the people willing to commit such crimes should "be left, in the first instance, to that branch of government which has the responsibility for maintenance of public order." *Jannotti*, 673 F.2d at 609.[13]

In sum, this Court should affirm the District Court's orders refusing to dismiss the indictment.

---

[13] Remarkably, Brooks attempts to portray the sting that ensnared him as *more* egregious than the one deployed in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). *See* DB27 (noting that the agents in *Twigg* proposed the scheme and provided all the tools necessary to carry it out, whereas here the Government simply proposed the scheme). But "[s]ince Twigg was decided, this Court has repeatedly distinguished, and even questioned, its holding." *United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017) (citing *Beverly*, 723 F.2d at 12). Besides, this Court has "rejected the argument that the government's invitation to engage in criminal activity rises to" the level of a due process violation "where, as here, the defendants used their own knowledge and connections to set up and carry out the unlawful conduct." *United States v. Stimler*, 864 F.3d 253, 274 (3d Cir. 2017).

**III.    Third Circuit Precedent Required The District Court To Reject
Defendant's Claim That There Was Insufficient Evidence To Prove
That The Hobbs Act Conspiracy, Had It Achieved Its Object, Would
Have Affected Interstate or Foreign Commerce.**

> **Standard of Review: Plenary.** *See United States v. McGuire*,
> **178 F.3d 203, 206 n.2 (3d Cir. 1999) (legal sufficiency);** *see
> also United States v. Singletary*, **268 F.3d 196, 198–99 (3d
> Cir. 2001) (statutory construction).**

Brooks argues that the Government could not and did not satisfy the
interstate commerce element of the Hobbs Act because the intended target of
the robbery—a stash house containing fifteen kilograms of cocaine—was
fictional. Brooks contends that the District Court thus should have granted a
judgment of acquittal on Count 1. DB33–37. His argument is meritless.

The Hobbs Act makes it a crime to "in any way or degree obstruct[],
delay[], or affect[] commerce" through robbery or extortion, or to "attempt[] or
conspire[] so to do." 18 U.S.C. § 1951(a). It defines "commerce" broadly to
include, *inter alia*, "all … commerce over which the United States has
jurisdiction." 18 U.S.C. § 1951(b)(3). That language "manifest[s] a purpose to
use all the constitutional power Congress has to punish interference with
interstate commerce by extortion, robbery or physical violence." *Stirone v.
United States*, 361 U.S. 212, 215 (1960); *see Taylor v. United States*, 136 S. Ct.
2074, 2079 (2016) (explaining that "[t]he language of the Hobbs Act is
unmistakably broad," reaching "any obstruction, delay, or other effect on
commerce, even if small").

31

The Hobbs Act covers inchoate crimes that, if successful, would have the requisite effect on interstate commerce. *Jannotti*, 673 F.2d at 592 ("In this case the defendants agreed to do acts which, had they been attainable, would have affected commerce. At that point, regardless of whether an actual effect on commerce was 'reasonably probable,' a sufficient federal interest was implicated to support federal jurisdiction over that agreement."). Under *Jannotti*, then, "factual impossibility, or the fact that the agreement was 'objectively unattainable,' is not a defense to a charge of conspiracy or attempt." *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011).

So understood, a conspiracy to rob a fictitious stash house of kilogram quantities of cocaine satisfies the jurisdictional element of the Hobbs Act. *See Taylor*, 136 S. Ct. at 2080 (a defendant who "attempts to affect … the intrastate sale" of drugs by attempting to rob a drug dealer satisfies the Hobbs Act's commerce requirement, even if the drugs he sought to steal did not exist); *see also United States v. Whitfield*, 649 F. App'x 192, 196 n.11 (3d Cir. 2016) (not precedential) (holding that conspiracy to rob fictitious drug stash house violated the Hobbs Act), *cert. denied*, 137 S. Ct. 1063 (2017); *United States v. Taylor*, 480 F.3d 1025, 1027 (11th Cir. 2007) (same); *United States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004) (same); *United States v. Bailey*, 227 F.3d 792, 797, 799 (7th Cir. 2000) (same for attempted robbery).

Here, a rational jury easily could have found the requisite effect on interstate or foreign commerce. The Government called an expert witness who explained that cocaine is produced in South America, and that any cocaine

32

that wound up in New Jersey must have traveled in interstate commerce. A686–87, A692. While that testimony was sufficient, *e.g.*, *United States v. McLean*, No. 16-2993, 2017 WL 3309762, at *6 (3d Cir. Aug. 3, 2017) (not precedential), it was superfluous: Congress has already determined that drug distribution constitutes commercial activity, *Taylor*, 136 S. Ct. at 2081 ("to satisfy the Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is 'commerce over which the United States has jurisdiction.'" (quoting 18 U.S.C. § 1951(b)(3))). And consistent with this settled authority, the District Judge instructed the jury that "a major portion of the traffic in controlled substances, such as cocaine, flows through interstate and foreign commerce." A798. Any rational jury would have found that a conspiracy to steal 15 kilograms of cocaine would "in any way or degree obstruct[], delay[], or affect[] commerce." 18 U.S.C. § 1951(a).

Brooks nonetheless asks this Court to impose a new legal requirement in Hobbs Act cases involving sting operations. Relying on *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*"), he claims that the Government must prove that the defendant would have engaged in the proscribed conduct without Government intervention. DB34–37. A panel of this Court recently rejected an identical argument. *McLean*, 2017 WL 3309762, at *5 ("*NFIB* concerned Congress' authority to compel commercial activity, not its ability to proscribe attempted or planned criminal activity."). As the *McLean* panel concluded, "That the Government fabricates a crime in a reverse

sting operation does not alter the fact that a defendant participant, of his own volition, contemplates and takes affirmative acts toward conduct which, if carried out as envisioned, would affect or potentially affect interstate commerce." *Id.*

In sum, this Court should affirm the District Court's pre- and post-trial orders refusing to dismiss Count 1.

**IV.**    **Any Alleged Error In Denying A Minor-Role Reduction Is Entirely Academic Given Brooks's Career Offender Status. In Any Event, Brooks Fails To Show Clear Error.**

> <u>Standard of Review</u>: **Plenary as to mootness,** *see Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Kelly*, **815 F.2d 912, 914 (3d Cir. 1987);** *see also United States v. Zabielski*, **711 F.3d 381, 387–89 (3d Cir. 2013), and clear error on the merits,** *see United States v. Self*, **681 F.3d 190, 200 (3d Cir. 2012).**

Brooks complains that the District Court clearly erred in refusing to award him a two-level minor-role reduction under U.S.S.G. § 3B1.2(b) for Count 2 (the drug-distribution conspiracy). DB38. This Court should dismiss that claim as moot or reject it under the harmless-error doctrine: Brooks's final offense level was determined by the Career Offender Guideline, rendering utterly academic the question of what the proper offense level would have been in the absence of the career offender designation. At any rate, Brooks cannot show clear error on this record.

Article III of the Constitution restricts federal court jurisdiction to "disputes capable of judicial resolution." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980). A dispute is incapable of judicial resolution "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). And "[f]or Article III mootness purposes," this Court must approach cases on an issue by issue basis. . . . [T]he continued viability of some issues does not breathe life into those that are no longer justiciable." *Finberg v. Sullivan*, 658 F.2d 93, 102 (3d Cir. 1980).

35

Here, the challenge to the District Court's refusal to award a minor-role reduction is moot. According to the Probation Office, Brooks's adjusted offense level would have been 32. *See* PSR ¶ 61. But because Brooks qualified as a career offender, *see* PSR ¶¶ 62 & n.2, 80, his final offense level automatically became 37, *see* PSR ¶ 62 (citing U.S.S.G. § 4B1.1(b) (chart)); *see also* U.S.S.G. § 4B1.1(b) ("if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply"); *United States v. Warren*, 361 F.3d 1055, 1058 (8th Cir. 2004) ("When a defendant is sentenced pursuant to the career-offender guideline . . . *[n]one of the other Chapter Three adjustments, whether upward or downward, apply to such a defendant*.") (emphasis added). The District Court adopted the PSR's recommendation that Brooks was a career offender, finding "the advisory guideline range is an offense level of 37, [and] a criminal history Category 6." A1018.

So understood, Brooks's final offense level would remain 37 even were this Court to conclude that the District Court should have reduced from 32 to 30 the offense level that would have applied had Brooks not been a career offender. Given that Brooks neither challenges his career offender designation nor complains of any collateral consequences stemming from his having been denied a minor-role reduction, he effectively seeks an advisory opinion from this Court. *See United States v. Hubbell*, 667 F. App'x 887, 888 (8th Cir. 2016) (unreported) (holding that the "applicability of the [minor-role] adjustment is an academic question" because Hubbell was a career offender); *United States v.*

36

*McNeil*, 90 F.3d 298, 300 (8th Cir. 1996) ("Because the district court correctly determined McNeil to be a career offender, McNeil's objections to the district court's other determinations concerning his role in the offense and the quantity of drugs involved in the conspiracy are moot."). *Accord United States v. Beason*, 238 F. App'x 854, 856 (3d Cir. 2007) (not precedential) (applying mootness doctrine to dismiss appellate challenge to a contested enhancement); *United States v. Roman*, 91 F. App'x 767, 769 (3d Cir. 2004) (not precedential) (same).[14]

Even if Brooks's sentencing claim is not moot, any error could only be harmless. An appellate court "shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. *Accord* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). In *Williams v. United States*, the Supreme Court held that a sentence based on an incorrect application of the Guidelines does not require a remedy when the error did not affect the sentence. 503 U.S. 193, 202–03 (1992).

Here, as explained above, the final offense level was determined by the Career Offender Guideline. That means the two-level adjustment sought by Brooks had no effect on the Guidelines range at step one of the post-*Booker* sentencing process. That alone is enough to render any error harmless. *See United States v. Sharma*, 190 F.3d 220, 229 (3d Cir. 1999) (error in calculating

---

[14]  Indeed, at sentencing, Brooks recognized that the minor role issue "could be a moot point" in light of his status as a career offender. A957.

loss amount was harmless, as it did not change the total offense level or
Guidelines range); *see also United States v. O'Neil*, 595 F. App'x 665, 666 (8th
Cir. 2015) (unreported) ("Any error in these findings, however, would
be harmless, because the court ultimately calculated a Guidelines range
corresponding to O'Neil's career-offender status."). Besides, the District Court
granted Brooks a five-level downward variance, A1025, proving that the
Court's view of Brooks's role in the offense did not affect the ultimate
sentence, *see United States v. Zabielski*, 711 F.3d 381, 387 (3d Cir. 2013).

In any event, there was no error at all, much less clear error. Under the
advisory Sentencing Guidelines, a defendant's offense level may be reduced by
two levels if the defendant was a "minor participant," U.S.S.G. § 3B1.2(b), *i.e.*,
someone who "is less culpable than most other participants, but whose role
could not be described as minimal," *id.* cmt. n.5. As the party seeking the
downward adjustment, Brooks bore the burden to prove his entitlement to it.
*See United States v. Price*, 13 F.3d 711, 735 (3d Cir. 1994).

The District Court held that Brooks had not done so. It cited
"overwhelming" evidence "that he understood the scope of the criminal
activity. He appeared to be in a position of authority, based on the
conversations that were recorded." A962. The Court added that Brooks
"brought two of the three guns," and noted that he had a stake in the success of
the robbery. A963. Indeed, Brooks "was in charge of the conspiracy, and so he
was fully involved and certainly no less culpable than Morales or Santana." *Id.*

38

A factual finding like this is reviewable only for clear error. *Price*, 13 F.3d at 735. That means this Court will disturb it only if it is "'completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.'" *United States v. Vitillo*, 490 F.3d 314, 330 (3d Cir. 2007) (citation omitted). And "when the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error." *United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997). That principle applies here, as ample record evidence supports the District Court's finding that Brooks not only brought two firearms with him on the day of the planned robbery, A561–63, A567–68, A574, A658–59, but assumed a leadership role in the conspiracy, interrupting Santana and asking Brown specific questions about the stash house and the two men guarding it, A1119–20; *see* A396–97, A670, A739–42; *see also Harris*, 548 F. App'x at 813 (*dictum*) (rejecting arguments similar to Brooks's in affirming the denial of a role reduction in a drug conspiracy arising from a stash-house sting).

In sum, this Court should dismiss—or, alternatively, reject—Brooks's claim of clear error.

39

**V.     The Invited Error Doctrine Bars Brooks From Arguing On Appeal That Conspiracy To Commit Hobbs Act Robbery Is Not A Crime Of Violence. In Any Event, Brooks Cannot Show Plain Error Because Third Circuit Precedent Forecloses His Claim.**

> <u>Standard of Review:</u> **Plenary as to the invited-error doctrine,** *United States v. Ozcelik*, **527 F.3d 88, 97 n.6 (3d Cir. 2008), otherwise plain error,** *see United States v. Robinson*, **844 F.3d 137, 143–44 (3d Cir. 2016),** *cert. denied,* **No. 17-5139, 2017 WL 3008904 (U.S. Oct. 2, 2017).**

The Supreme Court decided *Johnson v. United States*, 135 S. Ct. 2551 (2015), nine months *before* trial. Brooks now invokes *Johnson* to claim that the District Court erroneously instructed the jury that Hobbs Act robbery is a crime of violence. DB39–52. But Brooks waived this claim by jointly proposing the very jury instruction to which he now assigns error. Even if Brooks merely forfeited his claim, he cannot show error (much less plain error), because this Court has now definitively held that Hobbs Act robbery committed with a firearm is a crime of violence. *United States v. Robinson*, 844 F.3d 137, 144 (3d Cir. 2016), *cert. denied,* No. 17-5139, 2017 WL 3008904 (U.S. Oct. 2, 2017).

## A.     The Invited-Error Doctrine Bars Brooks's Claim.

"[A] court can not be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request." *Shields v. United States*, 273 U.S. 583, 586 (1927). That hoary principle dooms Brooks's claim that the District Court should not have told the jury that conspiracy to commit Hobbs Act robbery is a crime of violence.

Count 4 charged Brooks with violating 18 U.S.C. § 924(c) by carrying a firearm during and relation to either of two predicate offenses: the Hobbs Act

robbery conspiracy charged in Count 1 or the drug-distribution conspiracy charged in Count 2. A28. Just before trial, the Government filed "Joint Requests to Charge." Dkt. 89. Those Requests advised the District Judge that "[t]he Government and the defendant jointly submit these requests to charge regarding general matters of law, the essential elements of the crimes charged in the Superseding Indictment, and certain matters of evidence relevant to this case." *Id.* at 6.

Joint Request No. 49 addressed the § 924(c) count. It provided as follows:

> ***The offense alleged in Count 1 of the Superseding Indictment is a crime of violence*** and the offense alleged in Count 2 of the Superseding Indictment is a drug trafficking crime as defined by the statute.

Dkt. 89 at 80 (emphasis added). During the charge conference, Brooks did not object to that proposed instruction on the ground that *Johnson* rendered it an inaccurate statement of the law. A714 ("49, no change"). Accordingly, just as Brooks himself had requested, the final charge instructed the jury that "[t]he offense alleged in Count 1 of the Superseding Indictment is a crime of violence." A806.

Brooks nonetheless attempts to assign error to Instruction No. 49. He complains that the jury "was presented with two possible findings" with respect to the § 924(c) count: that Brooks carried the firearm during a crime of violence (*i.e.*, the Hobbs Act robbery) or a drug trafficking crime. DB40. Brooks then argues at length that Hobbs Act robbery is not a crime of violence, and he demands a remedy because the jury might have obeyed the instruction

41

to which he now assigns error. DB40–52. But "[b]ecause [Brooks] made a joint request in favor of the very instructions he now challenges, he waived his right to raise these instructional issues on appeal under the invited error doctrine." *United States v. Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008); *see United States v. Calloway*, 571 F. App'x 131, 135 (3d Cir. 2014) (not precedential) (challenge waived where defendant "submitted a joint request with the Government").

### B.    Brooks Cannot Show Plain Error Because *United States v. Robinson* Forecloses His Claim.

Even if Brooks did not waive his claim, he forfeited it by not timely objecting to the District Court's jury instruction that conspiracy to commit Hobbs Act robbery is a crime of violence. Fed. R. Crim. P. 30(d). He thus must show plain error to obtain a remedy. Fed. R. Crim. P. 52(b); *see* Point I.A *supra* (setting forth plain-error standard).[15]

Brooks's claim—that Hobbs Act robbery can never qualify as a "crime of violence"—fails at step one of the test for plain error. Section 924(c) defines a "crime of violence" as:

an offense that is a felony and —

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another [the "elements clause"], or

---

[15]  It makes no difference that Brooks raised his claim in a post-trial motion. A119–31. To properly preserve it, he had to raise it at a time when the alleged error could have been corrected, *i.e.*, during the charge conference. *See* Fed. R. Crim. P. 51(b); *see also United States v. Brennan*, 326 F.3d 176, 186 (3d Cir. 2003) (applying plain error review to claim of summation misconduct raised for first time in post-trial motion). He did not do so.

> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the
> course of committing the offense [the "residual clause"].

18 U.S.C. § 924(c)(3).

Brooks's argument relies on three Supreme Court decisions that construed similarly worded provisions of 18 U.S.C. § 924(e)(2)(B), the Armed Career Criminal Act ("ACCA"). First, Brooks contends that *Johnson v. United States*, 135 S. Ct. 2551 (2015) ("*Johnson 2015*"), invalidates § 924(c)(3)(B)'s residual clause. DB41–43. He then contends that, applying the strict categorical approach mandated by *Taylor v. United States*, 495 U.S. 575 (1990), the Hobbs Act does not require the sort of "physical force" the Supreme Court, in *Johnson v. United States*, 559 U.S. 133 (2010) ("*Johnson 2010*"), said the elements clause requires. DB43–50.

Unfortunately for Brooks, his claim is foreclosed by *Robinson*, 844 F.3d at 137. Convicted of Hobbs Act robbery and of a § 924(c) offense, Robinson advanced the same arguments Brooks advances here. He argued that *Johnson 2015* invalided § 924(c)(3)'s residual clause, and that under *Johnson 2010*, the Hobbs Act did not categorically involve the amount of physical force demanded by § 924(c)(3)'s elements clause. *Id.* at 140–41. Reviewing only for plain error, this Court rejected Robinson's argument.

This Court saw no need to decide whether *Johnson 2015* affected § 924(c)(3)'s residual clause, because it held that Robinson's offense qualified as a crime of violence under the statute's elements clause. *Robinson*, 844 F.3d at 141. Initially, this Court "did not agree" with the parties "that the

43

categorical approach applies here." *Id.* at 141. Rather, a district court could review the charges, evidence, and jury instructions to decide "whether the predicate offense was committed with 'the use, attempted use, or threatened use of physical force against the person or property of another.' The remedial effect of the 'categorical' approach," this Court concluded, "is not necessary." *Id.* (citation omitted). This Court had no trouble concluding that Robinson's Hobbs Act offense met the requirements of § 924(c)(3)'s elements clause:

> In addition to being convicted of Hobbs Act robbery, Robinson was convicted of brandishing a firearm while committing Hobbs Act robbery. The question, therefore, is not "is Hobbs Act robbery a crime of violence?" but rather "is Hobbs Act robbery committed while brandishing a firearm a crime of violence?" The answer to this question must be yes. . . . [T]he combined convictions before us make clear that the 'actual or threatened force, or violence, or fear of injury' in Robinson's Hobbs Act robbery sprang from the barrel of a gun.

*Id.* at 144.[16]

*Robinson* thus dooms Brooks's claim that Hobbs Act robbery is not a crime of violence under § 924(c)(3)'s elements clause. Granted, *Robinson* involved a completed armed robbery, whereas this case involves a conspiracy to commit an armed robbery. But that is irrelevant, as a panel of this Court recently held in a case arising from a stash-house sting:

---

[16] The Government maintains that the categorical approach applies to § 924(c) and that Brooks loses under that approach. *See Robinson*, 844 F.3d at 147–51 (Fuentes, J., concurring in part and concurring in the judgment).

> Although McLean did not ultimately use his firearm, the jury's contemporaneous findings of guilt recognized that the loaded guns featured prominently in McLean's plan for the unrealized robbery. As in *Robinson*, "the combined convictions before us make clear that the 'actual or threatened force, or violence, or fear of injury' in [McLean]'s Hobbs Act robbery sprang from the barrel of a gun."

*McLean*, 2017 WL 3309762, at *6 (citation omitted); *accord United States v. Turner*, 501 F.3d 59, 67–68 (1st Cir. 2007).

Here, as in *McLean*, the Superseding Indictment, jury instructions, and trial evidence showed that the object of the Hobbs Act conspiracy in which Brooks participated was to steal narcotics by brandishing loaded firearms. *See* A25, A28, A796–97, A805–10; *see also* A396–97, A400–03, A516–17, A561–74, A588, A658–59, A663–67, A670, A739–42, A1106, A1108–09, A1119–20. Just as in *Robinson* and *McLean*, "the combined convictions before us make clear that the 'actual or threatened force, or violence, or fear of injury' in [Brooks]'s Hobbs Act robbery sprang from the barrel of a gun." *McLean*, 2017 WL 3309762, at *6 (quoting *Robinson*, 844 F.3d at 144).

Further, Brooks cannot prove that any error (plain or otherwise) affected his substantial rights, let alone would work a miscarriage of justice if left uncorrected. "Where there is a clear alternative theory of guilt, supported by overwhelming evidence, a defendant likely cannot show that an instruction permitting the jury to convict on an improper basis was not harmless error." *United States v. Andrews*, 681 F.3d 509, 521 (3d Cir. 2012). Just so here.

For starters, Brooks concedes that the Count 2 drug-distribution conspiracy, on which the jury also convicted, is a valid § 924(c) predicate.

DB52. Beyond that, the jury unanimously found that Brooks possessed at least one firearm during and in relation to *some* crime. Further, the jury heard that "the tool of the trade here in the United States is guns and firearms for dealing with disputes in the drug trade," A695–96, reinforcing the truism that "drugs and guns all too often go hand in hand," *United States v. Lomax*, 293 F.3d 701, 706 (4th Cir. 2002). Finally, Brooks claimed only that no conspiracy ever formed and that he had not brought the guns that were recovered during the arrest. A832–33, A838–39. The jury necessarily rejected the first assertion; the second was legally immaterial. At any rate, Brooks never disputed—in the event the jury rejected his spin on the evidence—that the firearms recovered were possessed during and in relation to the drug-distribution conspiracy.

Put simply, Brooks has failed to show a reasonable probability that, had the § 924(c) count been limited solely to the drug-trafficking conspiracy charged in Count 2, a rational jury that made the findings this jury made would have had a reasonable doubt about his guilt on Count 4. *See Andrews*, 681 F.3d at 523 (defendant failed to prove that allowing jury to convict on invalid theory affected the verdict where overwhelming evidence supported valid theory); *United States v. Duka*, 671 F.3d 329, 355 (3d Cir. 2011) (same). *See generally United States v. Kennedy*, 576 F. App'x 76, 81 (3d Cir. 2014) (not precedential) (pattern of verdicts, coupled with overwhelming evidence, made it "clear that the jury would have found Kennedy guilty" even absent claimed instructional error).

Brooks now seizes on the general verdict to contend that it is impossible to know which crime of violence the jury found. DB52. That impossibility might matter if Brooks had preserved his claim. Had he done so, the Government would bear the burden to show beyond a reasonable doubt that the error did not affect the verdict. *E.g.*, *United States v. Wright*, 665 F.3d 560, 570 (3d Cir. 2012).[17] But where, as here, the claim is unpreserved, a mere possibility that the error affected the outcome is insufficient to meet a defendant's Rule 52(b) burden. *See Marcus*, 560 U.S. at 263 (rejecting Second Circuit's view that prejudice exists under Rule 52(b) if there is "any possibility" the error affected the outcome). Thus, Brooks's sole reliance on the ambiguity created by the general verdict is insufficient as a matter of law to show that the claimed instructional error affected his substantial rights. S*ee United States v. Hastings*, 134 F.3d 235, 243 (4th Cir. 1998) ("it is not enough for Phillips to establish that it is impossible to tell whether the verdict returned by the jury rested solely on the misinstruction"); *see also United States v. Mares*, 402 F.3d

---

[17] The Government might well have been able to satisfy that onerous burden because, had Brooks timely raised his *Johnson* claim, the Government would have requested a special verdict for Count 4 precisely so that it could argue later that any error caused by instructing it that Count 1 counted as a crime of violence was harmless beyond a reasonable doubt given the jury's reliance on Count 2. *E.g.*, *United States v. Hare*, 820 F.3d 93, 106 (4th Cir.) (relying on special verdict to conclude that, "even assuming that a Hobbs Act robbery is not a crime of violence, Appellants' verdicts may be sustained because the jury found Appellants guilty of possessing . . . a firearm in furtherance of the drug trafficking crime"), *cert. denied,* 137 S. Ct. 224 (2016).

511, 521 (5th Cir. 2005) ("if the effect of the error is uncertain so that we do

not know which, if either, side it helped[,] the defendant loses").[18]

In sum, the District Court did not plainly err by instructing the jury that

conspiracy to commit Hobbs Act robbery is a crime of violence, and any error

unquestionably did not affect Brooks's substantial rights.

---

[18] Brooks cites decisions applying *Johnson 2015* to the Career Offender
Guideline's residual clause, as if that supports his claim that *Johnson 2015*
invalidates § 924(c)(3)'s residual clause. *See* DB42–43 (citing, *e.g.*, *United States
v. Townsend*, 638 F. App'x 172 (3d Cir. 2015) (not precedential)). But *Townsend*
and decisions like it were abrogated by *Beckles v. United States*, 137 S. Ct. 886
(2017), as this Court recently acknowledged, *In re Hoffner*, 870 F.3d 301, ___,
2017 WL 3908880, at *4 n.7 (3d Cir. 2017) ("*Beckles* abrogated in part *United
States v. Calabretta*, 831 F.3d 128 (3d Cir. 2016), a direct appeal in which we
held that the career offender guideline's residual clause is unconstitutionally
vague.") (citation omitted).

## CONCLUSION

This Court should affirm the judgment of conviction and sentence.

Respectfully submitted,

WILLIAM E. FITZPATRICK
Acting United States Attorney

By:   s/ STEVEN G. SANDERS
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102-2535
(973) 645-2846

Date:    October 6, 2017

# CERTIFICATE OF COMPLIANCE

I hereby certify as an Assistant United States Attorney for the District of New Jersey that:

(1)    this brief contains 12,464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit prescribed by Fed. R. App. P. 32(a)(7)(B)(i);

(2)    this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared using a Microsoft WORD 2016 word-processing system and it is in a proportionally spaced typeface, namely Garamond, that is at least 14 points;

(3)    the text of the electronic PDF brief and appendix is identical to the text of the paper copies of the brief and appendix; and

(4)    The electronic PDF brief and appendix have been prepared on a computer that is automatically protected by a virus detection program, namely a continuously updated version of McAfee Endpoint Security 10.2, and no virus was detected.


_____ s/ Steven G. Sanders _____
Assistant U.S. Attorney


Dated:    October 6, 2017

## CERTIFICATION OF FILING AND SERVICE

I hereby certify that on October 6, 2017, I caused the Brief for Appellee to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, and by personally causing to be deposited, with the United States Postal Service as postage-prepaid first-class mail, seven paper copies of the Brief.

I also certify that October 6, 2017, I personally caused to be served on counsel for Appellant, Richard Sparaco, Esq., a true and accurate copy of the Brief for Appellee through the Notice of Docketing Activity issued by this Court's electronic filing system.

_____s/ Steven G. Sanders_____
Assistant U.S. Attorney

Dated: October 6, 2017